# Illinois Official Reports

## Appellate Court

---

### *Jacobs v. Yellow Cab Affiliation, Inc.*, 2017 IL App (1st) 151107

---

| | |
|---|---|
| Appellate Court Caption | MARC M. JACOBS, and DEBORAH JACOBS, Plaintiffs-Appellees, v. YELLOW CAB AFFILIATION, INC., and CORNELIUS C. EZEAGU, Defendants-Appellants. |
| District & No. | First District, Fourth Division<br>Docket No. 1-15-1107 |
| Filed | March 16, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-L-04995; the Hon. Daniel J. Lynch, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Steven R. Bonanno, Carlton D. Fisher, and Anne C. Couyoumjian, of Hinshaw & Culbertson LLP, and Richard C. Godfrey, R. Christopher Heck, and Catherine L. Fitzpatrick, of Kirkland & Ellis LLP, both of Chicago, for appellant Yellow Cab Affiliation, Inc.<br><br>Kevin Q. Butler, Cornelius E. McKnight, Stanley A. Kitzinger, Nathan P. Karlsgodt, Joanne M. Krol, and Bryan T. Butcher, of McKnight Kitzinger & Pravdic LLC, of Chicago, for other appellant.<br><br>Robert A. Clifford, of Clifford Law Office, and Timothy S. Tomasik and Patrick Giese, of Tomasik Kotin Kasserman LLC, both of Chicago, for appellees. |

Webster Chamberlain & Bean LLP, of Washington D.C. (Arthur L. Herold, of counsel), for *amicus curiae* Taxicab, Limousine & Paratransit Association.

Panel

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Ellis concurred in the judgment and opinion.
Justice Cobbs dissented, with opinion.

**OPINION**

¶ 1     Yellow Cab Affiliation, Inc. (YCA), was sued as the apparent principal of Chicago taxicab driver Cornelius C. Ezeagu, whose alleged negligence while exiting a highway caused a high speed crash and severe traumatic brain injuries to his passenger, attorney Marc M. Jacobs. YCA and Ezeagu now appeal from a $21.98 million jury verdict and judgment in favor of Jacobs and a $3.96 million award to his wife, Deborah Jacobs. YCA contends the trial court erred by (1) letting the Jacobses proceed on claims of apparent agency; (2) excluding evidence that the cab's appearance, which was the basis for the apparent agency allegations, was involuntary and mandated by Chicago ordinance; (3) giving a jury instruction relevant only to medical negligence claims; and (4 and 5) allowing evidence and a jury instruction as to the passenger's purported habit of taking YCA vehicles so that he could show, despite having no memory of the evening, that he had deliberately chosen the YCA vehicle. Ezeagu, who contends the accident was caused by his passenger's sudden urging to exit the highway when it was too late to safely do so, argues it was error to (1) allow an accident reconstruction expert to speculate about the cab's highway speed despite eyewitness testimony, (2) allow the passenger to put on testimony that he was a man of "careful habits," (3) give a confusing jury instruction about the passenger's habit of taking YCA cabs, (4) refuse a special interrogatory on sole proximate cause, and (5) reject a motion for remittitur of the wife's award for loss of consortium. We allowed Taxicab, Limousine & Paratransit Association (TLPA) to file an *amicus curiae* brief. For the following reasons, we affirm.

¶ 2     On August 31, 2005, at approximately 8 p.m., Ezeagu was parked in a cabstand in Chicago's River North neighborhood, across the street from the Joe's Seafood restaurant where Jacobs was having dinner with one of his long-term clients. As the client, Jean Zielinski, was departing in her own vehicle, Jacobs crossed the street, got into the back of Ezeagu's taxi, and asked to be taken home to Hinsdale, Illinois, which is a community southwest of Chicago.

¶ 3     Later, at about 8:45 p.m., Ezeagu lost control of the minivan on the cloverleaf exit ramp leading from northbound Interstate 294 (I-294) to Hinsdale. The posted highway speed limit was 55 miles per hour, and the cloverleaf's posted limit was 25 miles per hour. Opposing experts in accident reconstruction differed only somewhat in their opinions of the vehicle's actual speeds. The Jacobses' expert, Michael E. O'Hern, determined the cab was moving 60 to 70 miles per hour on the highway and had decelerated only to 58 miles per hour when it left the banked edge of the cloverleaf. YCA and Ezeagu's expert, Roger W. Barrette, calculated a

range of 55 to 60 on the highway, thus, leaving open the possibility that Ezeagu was not speeding on I-294, but was nonetheless moving at 53 or 54 miles per hour when he lost control on the cloverleaf. After slipping beyond the curved ramp, the speeding taxi went airborne for 32 feet, struck the ground and continued forward over a grassy drainage area, and then crashed into a concrete retention wall at either 43 or 46 miles per hour according to the Jacobses' expert or 47 miles per hour according to the defense expert. Ezeagu stepped out from the vehicle, fell down, and was initially unable to stand. Other motorists came to assist and called for emergency responders, and then the driver was able to call his brother, Matthew C. Ezeagu, who was the owner of the minivan and its Chicago cab license.

¶ 4    Because Matthew's corporation, Zegus, Inc. (Zegus), paid weekly fees to affiliate the cab with YCA, it was painted in YCA's all-over, bright yellow color scheme and bore the YCA logo. YCA did not own vehicles or Chicago cab licenses or employ drivers. Instead, pursuant to local ordinance, YCA was an "Affiliation" that provided its membership of cab license owners "with a Chicago business address, telephone number registered to the affiliation, color scheme where applicable, a trade name or emblem where applicable, a two-way radio dispatch system, insurance and the designation of an authorized registered agent." Chicago Municipal Code § 9-112-010(a) (amended Nov. 15, 2000) (section setting out "Definitions"). The ordinance further provided that "All taxicab vehicles belonging to a single affiliation must display that affiliation's color scheme and logo." Chicago Municipal Code § 9-112-360(a) (added Jan. 18, 2012) (section regarding "Taxicab vehicle color schemes").

¶ 5    Emergency medical responders found Jacobs on the floor of the minivan, behind its front seats. He was unresponsive, his breathing was slow and labored, and his jaw was too tightly clenched for intubation, which were indications that he had suffered serious head trauma and was in need of critical injury care. In the ambulance, Jacobs scored only 5, and then only 3, on the Glasgow Coma Score, with 3 being the lowest possible score for a living person. Jacobs subsequently filed this negligence suit and went to trial on a third amended complaint, which included one count against Ezeagu, one count against YCA, and his wife's two counts of loss of consortium.

¶ 6    It is undisputed Jacobs had no memory of a five-week period that began about a week before the accident. Since he could not testify about what occurred on that evening in late August but needed to prove that he had deliberately chosen the YCA vehicle, Jacobs intended to put on evidence of his past behavior and argue in part that he continued his practice. The trial court denied YCA's motion *in limine* No. 12 to bar the Jacobses from presenting habit evidence. The court also denied Ezeagu's motion *in limine* to bar the Jacobses' accident reconstruction expert from testifying about the highway speed of the cab, despite Ezeagu's argument that the expert's opinion was unnecessary when there were eyewitness accounts. In addition, the trial court granted the Jacobses' motion *in limine* No. 23 to bar evidence of Chicago's taxicab regulations affecting the cab's appearance and of the contractual relationship between YCA and the cab's owner, Zegus, on grounds that whether there was an actual agency was not relevant to claims alleging the appearance of agency.

¶ 7    The jury trial lasted just over two weeks in March 2015 and included evidence about the night of the accident as well as Jacobs's subsequent medical care, his inability to continue practicing law, and difficulties in his relationship with his wife. The following summary excludes details of his medical treatment and employment and focuses on the evidence relevant to the appellate arguments.

¶ 8        Zielinski testified that prior to the accident in 2005, she became Jacobs's client in 1996 when she was a vice president and manager in a commercial real estate group of Wells Fargo Bank and had retained Jacobs to write loan documents for the 20 to 30 large commercial loans which she was closing every year. Jacobs's office was across from hers on Franklin Street in Chicago, and at least 40 to 50 times a year, they met at the cabstand on his side of the street to travel together to lunch or dinner meetings or to her clients' offices. Jacobs would always select a Yellow Cab and would have them step out of the queue if necessary to wait for a Yellow Cab. Because Jacobs was paying their cab fare, Zielinski never questioned his insistence on Yellow Cabs and "just figured, you know, everyone has their quirks" and that "[Jacobs] was a Yellow taxi man like [Zielinski] flew United for business all the time." She never saw Jacobs take a taxi other than a Yellow, except for once when they were in San Francisco. On the night of the accident, Jacobs waited with her outside the restaurant until the valet returned with her car, she offered to take Jacobs to the train station, as she sometimes did, but he declined, saying to her, "I'm going to go grab the Yellow cab," since there was one waiting across the street.

¶ 9        Ezeagu, who was born in 1972, testified that he became a licensed chauffeur about four months before the accident. To qualify for the Chicago license, he took a course in 2005 conducted by the municipality at Harold Washington College, addressing road safety and other topics, and then passed an exam. He had also taken a two-hour course at YCA's headquarters on how to use the Gandalf system, and afterward YCA assigned him a personal number which he could enter into the Gandalf if he "need[ed] a fare." He subsequently leased Chicago cab No. 160 from his brother's corporation. Ezeagu had been parked in the cabstand for about 5 to 10 minutes and become the first cab in line by the time Jacobs walked across the street from the restaurant. After Jacobs asked to be taken to Hinsdale and Ezeagu said he did not know the way, Jacobs responded that he would provide directions as they went. Complying with his passenger's instructions, Ezeagu then drove to Lakeshore Drive, merged onto Interstate 55, and proceeded onto northbound I-294. Ezeagu then asked where they would be exiting and Jacobs responded, "[K]eep going, I will direct you." Jacobs, however, was "with his phone" until moments before the crash when he screamed "Get off here," meaning that Ezeagu should take the exit. At the time, Ezeagu was driving "in the second lane to the right," so he "quickly tried to get into the right lane to *** enter the ramp." However, he lost control of the minivan as he entered the cloverleaf exit ramp, at "maybe like 50 [mph]."

¶ 10       Ezeagu's account differed to some extent from that of eyewitness Ruben Arce, who testified that at about 8:45 p.m., he was riding in the passenger seat of a commercial box truck heading north in very light traffic on I-294. Arce's box truck was in the far right lane of the four northbound lanes, moving at about 55 to 60 miles an hour, which was slightly slower than the car traffic. Arce noticed the yellow taxi because, without signaling, it "just swerved to the right" and "cut in front" of Arce's truck, moving all the way from the far left lane to the far right lane, off the highway, and into a ditch. This occurred about a quarter of a mile before the Ogden exit and "it didn't seem like [the taxi driver] was making an exit." Arce's truck was "doing at that time between 57, 58—between 55, 60" and the taxi "was going faster than [that]." Arce did not see any brake lights, and it appeared that the driver actually sped up in the ditch because the taxi flew up before landing on the ramp and continuing forward across the grassy area until it hit the wall.

¶ 11        The plaintiffs' certified crash reconstruction expert was Tinley Park police officer O'Hern, who supervises the police department's accident reconstruction team and has reconstructed more than 1000 accidents, most of them involving serious injuries or fatalities. O'Hern reviewed the Illinois police reports, reconstruction report, and photographs; read depositions; inspected and took measurements of the 2003 minivan and an undamaged exemplar; and, surveyed the actual crash site, which he was able to pinpoint based on the police photos and gouges that the cab made when it struck the concrete wall. This information enabled him to create a diagram of the scene and use crash data created by the National Highway Traffic Association, which led O'Hern to conclude that the speed of the taxicab was between 43 and 46 miles per hour when it hit the concrete wall. Then, working backwards through the event, he determined the cab's speed when it failed to navigate the curved exit ramp and vaulted into the air for approximately 32 feet. Depending on how much the driver had braked, the cab must have been traveling 57 to 71 miles per hour on the highway, but most likely 60 to 70 miles per hour, before it veered off the exit ramp. Therefore, the cab had been moving faster than the posted highway speed limit of 55 miles per hour and faster than the exit ramp posted speed of 25 miles per hour. If Ezeagu had been traveling at 55 miles per hour as he stated in a deposition, and had fully braked, then the cab would have travelled less than 252 feet, instead of striking the concrete barrier which was 336 feet from the roadway. When asked whether he had used and believed the eyewitness Arce's testimony, O'Hern answered affirmatively:

> "They said they were traveling about the same speed as traffic. Well, [I-294] when it's light traffic or medium traffic as they said, it doesn't travel 55 to 60. It travels around 70.
>
> So in terms of they're traveling with traffic, but they're only going 55 to 60, they also said that the taxicab accelerated to get in front of them, which would put the taxicab going faster than 60. Their testimony is consistent with my findings."

¶ 12        O'Hern was also asked about testimony indicating the cab and the eyewitness were traveling with the flow of traffic. O'Hern said that as a police officer for almost 26 years, he knew that the flow of traffic is "usually 10 miles an hour or more over the speed limit on a highway, and it's usually a lot more[,] being realistic here" and also that a traffic study for the tollway system had shown that the average speed was 70 miles an hour.

¶ 13        The defendants' certified crash reconstruction expert, Lake Villa police department officer Barrette, indicated he had 30 years experience in law enforcement, extensive training in mechanical engineering and accident reconstruction, and was part of Lake County's major crash assistance team, which is a 40-member team of accident investigators, any one of whom may be called to near-fatal and fatal accidents in Lake County, Illinois, to investigate and recreate the crashes. Together, Barrette, O'Hern, and several lawyers visited the crushed vehicle and the crash site to record their observations and measurements. The two experts used essentially the same information and processes as they worked backward through the event to form their opinions. Although O'Hern determined Ezeagu's collision speed with the wall was 43 miles per hour, Barrette determined it was 47 miles per hour, because the cab not only struck the concrete, but also had sufficient residual energy to then shift 10 feet to the left. Barrette and O'Hern also made different assumptions about how strongly the driver depressed the brakes as the cab slid over the grass. O'Hern believed Ezeagu braked somewhat, but Barrette concluded there was no evidence of braking. This was one of the reasons O'Hern calculated slightly higher speeds than Barrette did for the cab as it left the cloverleaf and when

it was on the exit ramp of the highway. Barrette also said eyewitness Arce testified that the cab was moving 55 to 60 miles an hour on the exit ramp.

¶ 14     The vehicle owner (Matthew Ezeagu) testified that as an affiliate of YCA, he had to paint his white Chrysler Town & Country minivan a certain color and then have the vehicle approved by YCA. He chose to have the paint applied by a body shop in the Rogers Park neighborhood and then took the minivan to YCA for its approval. He was then able to purchase a YCA logo from YCA and have it affixed to the cab's door, purchase a YCA radio, and make use of YCA's credit card system. He chose to affiliate with YCA because it was "one of the more popular affiliations," and the YCA logo denoted quality and good customer service. He paid weekly fees to YCA, and if he did not make the payments, their relationship would "be cancelled." Inside the cab, visible to the passenger was a license card or "hard card" that informed the passenger how to contact the city's consumer services office with any complaints and stated Zegus was the owner of the cab and cab medallion No. 160.

¶ 15     Jacobs testified that his habit of taking Yellow Cabs started in the late 1980s when his work required him to use a lot of cabs. Chicago cabs seemed to be either Checker or Yellow, and he had a bad experience with a Checker driver. Jacobs recalled:

> "I was in a Checker cab with a driver who was very reckless. I kind of feared for my life. He was making unusual moves and cutting off other cars. It was a terrible experience.
>
> I am a very risk adverse person. So I thereafter just went for Yellow cabs. And they were everywhere. It didn't matter if I wanted to stick with taking Yellow cabs all the time because you could always get one. They were everywhere.
>
> So even after the nice bloated style sedans got shrunk down to normal sedans, I still had good experiences with Yellow. They were cleaner. They were well maintained. The drivers were responsible. They were my cab company."

¶ 16     During this time period, Jacobs thought that the drivers were employees of Yellow Cab. He also testified that his loyalty to "the brand of Yellow Cab" was reinforced when he observed a lot of other taxis during his walks from the Metra station and noticed that the back seats of those vehicles were dirty and the cabbies were "driving a little dangerously." When asked whether he had chosen Ezeagu or Yellow Cab on the night of the accident, Jacobs responded, "Since Yellow Cab was my cab company, then I can say without a doubt I was relying on Yellow Cab as I had hundreds of times before."

¶ 17     Jacobs's cell phone records did not support Ezeagu's account of the accident. In 2005, Jacobs's employer did not provide a cell phone, but he had a personal "flip" (hinged or clamshell) style cell phone which he used infrequently. His phone records indicated that on the morning of the accident, Jacobs made two calls around 8 a.m. and that in the evening he made four calls. At 7:37 p.m., Jacobs dialed his voicemail account for two minutes, called home at 8:14 p.m. for five minutes, called a friend's number at 8:19 p.m. for two minutes, and then called voicemail again for one minute beginning at 8:25 p.m. Depending on traffic, it would have taken 35 to 45 minutes to drive from Grand Avenue and Lake Shore Drive to I-294 and Ogden Avenue.

¶ 18     Jacobs also testified that when he worked late at the office, he would take a Flash Cab home because he could pay for the cab fare and tip with a voucher which his law firm would then bill back to a particular client.

¶ 19        Robert William Ellis was the manager for customer services at YCA. Ellis died before the trial, but portions of his discovery deposition were read into the record. Ellis explained that YCA contractually authorized and required its affiliated taxicab medallion holders to use the YCA color scheme and logo on the exterior of their cabs. The yellow paint and logos would be affixed by a "qualified shop" rather than by YCA. YCA also provided its affiliates with "free" car washes at its own facility and with Gandalf radio calls, which were fare requests that a driver could choose to accept or not accept. Each affiliated cab owner paid YCA weekly for the relationship. Ezeagu leased cab No. 160 from his brother's corporation and had no direct relationship with YCA. Inside the cab, in plain view of the passenger, were Ezeagu's chauffer's license and the "hard card" identifying the brother's corporation, Zegus, as the owner of cab No. 160.

¶ 20        John Moberg, the president of Wolley Cab, Inc., doing business as Checker Taxi Affiliation, had been in the taxicab industry for well over 30 years, beginning as a driver for Checker Taxi Company in 1978 and then in various management positions with Checker Taxi Company and Checker Taxi Association. Moberg said he was familiar with the appearance of Chicago cabs when the accident occurred in 2005 and when he testified during the 2015 trial. He was shown 20 recent photographs of 10 different Chicago cabs, including Blue Ribbon Taxi Association, Inc., Checker Taxi Affiliation, Inc., Choice Taxi Association, Inc., City Service Taxi Association, Dispatch Taxi Affiliation, 5 Star Taxi Association, Koam Taxi Association, Inc., Service Taxi Association, Inc., Sun Taxi Association, Inc., and Top Cab Association. The photos showed a full view of each vehicle and then a closer view of the vehicle's "insignia," logo, or emblem on the right rear door. Moberg confirmed that, in most instances, the logos or emblems used in 2015 had been identical in 2005. Moberg also indicated that as soon as a passenger "sits in the back [seat] of the cab," "the hard card that is assigned to every particular car, which describes the owner of that taxi" would be "visible" to the passenger.

¶ 21        Prior to closing arguments, YCA unsuccessfully moved for a directed verdict on grounds that the plaintiffs failed to prove two of the three elements of an apparent agency claim, including that YCA had affirmatively held out the driver as its agent on the night of the accident and that Jacobs relied on that appearance when he chose the cab, as opposed to merely getting into the closest, most convenient cab.

¶ 22        In closing arguments, the plaintiffs' attorneys argued that in 2005, YCA-affiliated cabs were marked with the same "iconic emblem" that had been painted on Yellow Cab Company's vehicles when Jacobs first moved to Chicago in the 1980s and started preferring that brand of taxicab. Counsel argued that YCA held out "history" and that Jacobs was loyal to the "brand" when he "selected those cabs for over 15 years."

¶ 23        After deliberations, the jury returned its verdict in the plaintiffs' favor, in the total amount of $29.5 million which was reduced by 12% for the passenger's contributory negligence. The jury also answered three special interrogatories in the plaintiffs' favor: (1) "Did Yellow Cab Affiliation, Inc., hold itself out as a provider of taxicab services?" (2) "Did Marc Jacobs know, or should he have known, that Cornelius Ezeagu was not an employee of Yellow Cab Affiliation, Inc.?" and (3) "Did Marc Jacobs rely on Yellow Cab Affiliation, Inc., to provide him taxicab services?"

¶ 24     YCA filed a posttrial motion seeking judgment or a new trial. The motion reiterated YCA's prior arguments and the trial court denied the motion. YCA immediately filed a Chapter 11 bankruptcy petition, and then, with the bankruptcy court's authorization, this appeal.

¶ 25     YCA's main contention is that it did not "hold out" Ezeagu as its agent and that allowing the Jacobses to maintain and recover on a tort claim against YCA on the basis of the appearance of the cab was error, because the interior and exterior appearance of the vehicle was dictated by the comprehensive taxicab regulations found in chapter 9-112 of the Municipal Code of Chicago (Code). Chicago Municipal Code § 9-112-010 *et seq.* (amended Nov. 15, 2000). YCA asserted this argument in various motions throughout the proceedings and contends the trial court's rulings eliminated the first prong of an apparent authority claim and also negated *Daniels v. Corrigan*, a First District decision indicating that YCA's compliance with the Code did not create an actual agency relationship with a cab driver. *Daniels v. Corrigan*, 382 Ill. App. 3d 66, 77-80, 886 N.E.2d 1193, 1207-08 (2008). YCA contends the judgment is particularly unfair when, under the ordinance then in effect, YCA would have been fined had it painted on the cab's exterior the words "independently owned and operated by" and the medallion owner's name. YCA contends there was no way for it to have modified its conduct or otherwise minimized its exposure to liability for the actions of a cab driver with whom it had no relationship and could not control. YCA further argues that because the Code-mandated "hard card" of the medallion owner's license was prominently displayed inside the vehicle stating "Zegus, Inc." instead of stating "Yellow Cab Affiliation, Inc.," Jacobs could not have reasonably relied on the driver being YCA's agent. See *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 202, 854 N.E.2d 635, 665-66 (2006) ("if a patient is placed on notice of the independent [contractor] status of the medical professionals [at the hospital], it would be unreasonable for a patient to assume that these individuals are employed by the hospital" and the patient cannot argue "there was an appearance of agency between the independent contractor and the hospital").

¶ 26     YCA contends the Jacobses' suit should never have gone to trial and would not have if the court had properly granted YCA's motion for summary judgment in 2009 as to the Jacobses' first amended complaint or YCA's motion for summary judgment in 2013 as to the Jacobses' second amended complaint. Circuit Court Judge Thomas Quinn presided over the first motion for summary judgment and Circuit Court Judge James N. O'Hara presided over the second motion for summary judgment. The trial and posttrial proceedings were conducted by Circuit Court Judge Daniel J. Lynch. YCA contends it was error when Judge Lynch granted the Jacobses' motion *in limine* No. 23 in 2015, prohibiting all evidence at trial of the Code's extensive regulation of taxicabs and the contractual relationship between YCA and the cab's owner and that this ruling prevented the jury from understanding that the cab's appearance was mandated by the Code and not YCA. YCA unsuccessfully repeated this argument in its motion for a directed verdict and its posttrial motion for judgment notwithstanding the verdict, or in the alternative, a new trial.

¶ 27     *Amicus curiae* TLPA is national organization that represents owners and managers of taxicab, limousine, sedan, airport shuttle, paratransit, and nonemergency medical fleets. TLPA suggests the verdict cannot stand because of its "ominous" potential impact: it exposes every Chicago taxi affiliation to apparent agency liability and, if YCA follows through on its bankruptcy filing, then YCA affiliates might have to switch to some other organization and bear the expense of repainting their vehicles and the inconvenience of switching out their

meters, dispatch radios, and credit card processing equipment. TLPA also suggests it was error to bar evidence of the Code overlaying the relationship between cab affiliations and drivers, and that it could not be coincidental that within weeks of YCA's bankruptcy filing, Chicago revised the Code to permit medallion owners to display on their vehicles "Owned By" or "Independently Owned By" followed by their full names. TLPA also calls our attention to *Daniels*, 382 Ill. App. 3d 66, 886 N.E.2d 1193, and similar precedent.

¶ 28 The Jacobses respond that the Code is silent on the design of the cabs, the logos used, and the branding that YCA deliberately engaged in when it duplicated the appearance of the classic Yellow Cab Company's vehicle. The Jacobses contend YCA apparently wanted to capitalize on the cab company's historic good will and reputation in Chicago, while minimizing into obscurity the fact that the historic fleet of cabs and employed drivers no longer exist and have been replaced by an affiliation relationship. The Jacobses contend that the perception that Yellow Cab was still a unified, monolithic brand was the result of YCA's own calculated and volitional marketing decision to use the historic Yellow Cab Company's color scheme and nearly the same logo, and consequently, YCA was "holding out" the driver as its agent. The Jacobses also contend the precedent YCA relies upon is not on point. Furthermore, the words "owner" or "operator" do not appear on the "hard card," meaning that Jacobs was not put on notice of the owner or operator's true identity. The Jacobses conclude there is no merit to YCA's argument that it cannot be held liable under the theory of apparent agency.

¶ 29 YCA first argues the merits of its two motions for summary judgment, motion for a directed verdict, and posttrial motion, followed by the merits of granting the Jacobses' motion *in limine* No. 23, and the proper way to instruct the jury.

¶ 30 The denial of a motion for summary judgment is usually not reviewable after the case has been tried, but YCA contends its two motions for summary judgment present the exception of an issue of law which was not presented to the jury. See *Valentino v. Hilquist*, 337 Ill. App. 3d 461, 467, 785 N.E.2d 891, 897 (2003) (addressing defendants' arguments that they were not liable for judgment where statutes immunized governments from tort liability and made workers' compensation system the exclusive remedy); *Battles v. La Salle National Bank*, 240 Ill. App. 3d 550, 558, 608 N.E.2d 438, 443 (1992). We find, however, that the merits of YCA's argument for summary judgment as to the (first) amended complaint became moot in 2009 when the Jacobses filed their second amended complaint and that the merits for YCA's argument as to the second amended complaint became moot in 2015 when the Jacobses filed their third amended complaint. When an amendment does not refer to or adopt a prior pleading, the earlier pleading ceases to be a part of the record for most purposes, being in effect abandoned and withdrawn. *Foxcroft Townhome Owners Ass'n v. Hoffman Rosner Corp.*, 96 Ill. 2d 150, 154, 449 N.E.2d 125, 126 (1983). Furthermore, the arguments for summary judgment reappeared during the trial in opposition to the Jacobses' motion *in limine* No. 23, in YCA's motion for a directed verdict, and in YCA's posttrial motion, and these three latter arguments are unquestionably reviewable.

¶ 31 The following legal principles are pertinent to those reviewable rulings. "Apparent authority in an agent is the authority which the principal knowingly permits the agent to assume, or the authority which the principal holds the agent out as possessing." *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 523, 622 N.E.2d 788, 795 (1993); Restatement (Third) of Agency § 2.03 (2006). A principal's manifestation of its agent's authority is conduct that is observable by others that expresses meaning, and the relevant state of mind is that of the

person who observes or otherwise learns of the manifestation. Restatement (Third) of Agency § 1.03 cmt. b (2006). Thus, when a purported principal has created the appearance that someone is his or her agent, and an innocent third party has reasonably relied on the apparent agency and been harmed as a result, the apparent principal should not be permitted to deny the agency. *O'Banner v. McDonald's Corp.*, 173 Ill. 2d 208, 213, 670 N.E.2d 632, 634 (1996). With respect to that third party, the concept of apparent authority will overcome any restrictions that the principal may have privately imposed on the agent. Restatement (Third) of Agency § 2.03 cmt. c (2006). In order to impose liability on the basis of apparent authority, an Illinois plaintiff need only show "(1) that the principal held the agent out as having authority or knowingly acquiesced in the agent's exercise of authority; (2) based on the actions of the principal and agent, the third person reasonably concluded that an agency relationship existed; and (3) the third person relied on the agent's apparent authority to his detriment." *Oliveira-Brooks v. Re/Max International, Inc.*, 372 Ill. App. 3d 127, 137, 865 N.E.2d 252, 260 (2007) (citing *Gilbert*, 156 Ill. 2d at 525, 622 N.E.2d at 795).

¶ 32 "It is not the conduct or words of the apparent agent that creates an apparent agency, but rather, the words or conduct of the apparent principal." (Emphasis omitted.) *Tierney v. Community Memorial General Hospital*, 268 Ill. App. 3d 1050, 1062, 645 N.E.2d 284, 293 (1994). The manifestations by the apparent principal may be made directly to the third party or may be made to the community by signs or advertising. Restatement (Second) of Agency § 8 cmt. b (1958). See, *e.g.*, *Gizzi v. Texaco, Inc.*, 437 F.2d 308 (3d Cir. 1971) (discussing the local display of insignia and slogan and the national advertising done by the Texaco chain of automobile service stations). Either the principal must intend to cause the third party to believe that the agent is authorized to act for the principal or the principal should realize that his or her conduct is likely to create such belief. Restatement (Second) of Agency § 27 cmt. a (1958). "A principal may not choose to *** clothe[ ] [someone] with the trappings of [agency] and then determine at a later time whether the consequences of their acts offer an advantage." Restatement (Third) of Agency § 2.03 cmt. c (2006).

¶ 33 The concept of apparent agency is also described in section 267 of the Restatement (Second) of Agency as, "One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such." Restatement (Second) of Agency § 267 (1958). The first illustration in the Reporter's Notes for section 267 uses facts similar to the facts of the current case to describe this principle: "P, a taxicab company, purporting to be the master of the drivers of the cabs, in fact enters into an arrangement with the drivers by which the drivers operate independently. A driver negligently injures T, a passenger, and also B, a person upon the street. P is not liable to B. If it is found that T relied upon P as one furnishing safe drivers, P is subject to liability to T in an action of tort." Restatement (Second) of Agency § 267 cmt. a, illus. 1 (1958).

¶ 34 Evidence that is not relevant is not admissible. *Clemons v. Mechanical Devices Co.*, 292 Ill. App. 3d 242, 251, 684 N.E.2d 1344, 1350 (1997). "Relevant evidence" is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." (Internal quotation marks omitted.) *DiCosola v. Bowman*, 342 Ill. App. 3d 530, 535, 794 N.E.2d 875, 879 (2003). "One of the tests that a trial court may use when evaluating relevance is to ask how it would

view this evidence if it were the trier of fact. Would the proposed evidence assist the trial court in resolving questions of fact? [Citation.] If not, then the evidence should be excluded." *First Midwest Trust Co. v. Rogers*, 296 Ill. App. 3d 416, 430, 701 N.E.2d 1107, 1116 (1998). Furthermore, even relevant evidence may have drawbacks that require it to be excluded, including when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011); *Demos v. Ferris-Shell Oil Co.*, 317 Ill. App. 3d 41, 53, 740 N.E.2d 9, 18 (2000) ("even if the evidence is arguably relevant it may still be excluded if it would confuse the issues or tend to mislead the jury"). Thus, parties are not permitted to bring in any and all evidence they might think will help their claim or defense.

¶ 35    The admission of evidence is within the sound discretion of the trial court, and we will not reverse the court's ruling unless that discretion was clearly abused. *Gill v. Foster*, 157 Ill. 2d 304, 312-13, 626 N.E.2d 190, 194 (1993). A trial court is also "vested with broad discretion to grant a motion *in limine* as part of its inherent power to admit or exclude evidence." (Internal quotation marks omitted.) *DiCosola*, 342 Ill. App. 3d at 535, 794 N.E.2d at 879. In determining whether there has been an abuse of discretion, a reviewing court may not substitute its judgment or even determine whether the trial court exercised its discretion wisely. *DiCosola*, 342 Ill. App. 3d at 536, 794 N.E.2d at 879. An abuse of discretion has occurred when it can be said that no reasonable person would adopt the same view as the trial court. *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 176, 685 N.E.2d 871, 876 (1997). The abuse of discretion standard is " 'the most deferential standard of review available with the exception of no review at all.' " *People v. Coleman*, 183 Ill. 2d 366, 387, 701 N.E.2d 1063, 1074 (1998) (quoting Martha S. Davis, *A Basic Guide to Standards of Judicial Review*, 33 S.D. L. Rev. 469, 480 (1988)).

¶ 36    The record on appeal contains all of the deposition transcripts that were presented in opposition to the Jacobses' motion *in limine* No. 23, and we briefly summarize that testimony. Ellis said his connection to the Yellow Cab entities began in 1971 when he was a commissioned driver operating Yellow Cab Company's vehicles and being paid a percentage of the money he "booked" or made per shift. Between 1979 and 1987, Ellis leased a vehicle from Yellow Cab Company, and between 1987 and 1994 he was one of Yellow Cab Company's cashiers. In 1994, Ellis switched over to managing city citations and insurance subrogation for Yellow Cab Company,[1] and in 2005, when Yellow Cab Company "faded away" as an entity and "became Yellow Cab Management," Ellis's management position moved over to the new YCA entity. Ellis was 1 of about 10 YCA managers reporting to a supervisor who reported to YCA's president, Dan Deleo.

¶ 37    Ellis said YCA collected affiliation fees only and took no control or interest in whether an affiliated cab was actually used to transport fare paying customers. The medallion owner and the driver of a cab were responsible for vehicle repairs and towing and could have the work

---

[1]According to *Daniels v. Corrigan*, 382 Ill. App. 3d 66, 68, 886 N.E.2d 1193, 1198 (2008), in 1997, Yellow Cab Company formed a network of corporations, and then sold its medallions to YellowOne and YellowTwo and its "name, colors, and dispatch rights" to Yellow Cab Management. YellowOne and YellowTwo's medallions were then affixed to a fleet of cabs owned or leased by Yellow Cab Management.

done by anyone they chose, and they also controlled the driver's routes, work hours, and so forth, and were responsible for gas, tolls, tickets, and fines. The medallion owner did not share fares or tips with YCA and only had to pay weekly fees. Therefore, the owner could choose to have the vehicle sit unused or use it for personal purposes. Ellis was asked about Chicago's cab ordinance and indicated that the municipality regulated the exterior and interior appearance of taxicabs and issues citations and fines for unauthorized marking or signage. A cab driver could not display advertising or decorate the interior of the vehicle, and the only authorized interior signage was a rate sign, a placard stating rights and duties, and a "hard card." YCA does not employ drivers. YCA could not tell drivers to put "independent contractor" or "not an employee of Yellow Cab" on the exterior of their vehicles, because Chicago has the sole authority and discretion about what goes on the outside of cabs and does not allow any markings "except for the ones that they approve." If a driver failed to post his chauffer's license and the hard card, he could be "pulled over by the City of Chicago police," cited, and possibly fined. This could also happen if the driver decided to add something unauthorized to the exterior of the cab, such as advertising, or to the interior of the cab, such as stuffed animals.

¶ 38     When speaking of the relationship between YCA, medallion owners, and drivers, Ellis explained that not just any medallion owner could affiliate with YCA and not just anyone could drive a cab affiliated with YCA. Ellis said a medallion owner who wanted to affiliate with YCA would "come to [YCA] and explain what it is he wants to do and if it's acceptable, we [YCA] accept him" and that an individual cab driver would also have to be "acceptable."

¶ 39     YCA did not own any medallions, they were owned by other corporations and individuals. Those other corporations included YC-1 which in 2000 owned 900 medallions and in 2005 owned seven medallions. Another corporation was YC-2 which owned 2000 medallions in 2000 and only seven in 2005. The business of these two "YC" corporations was to lease their medallions. YCA sold no medallions after 2005. Ellis estimated that 2500 medallions affiliated with YCA. Every one of the medallion owners affiliated with YCA has to "use a [vehicle] that has the Yellow Cab colors, insignia and logos." YCA's color scheme and logos were not designed by the city. Each affiliation or association could choose how their cabs would appear and would draw up a plan for approval by the city. The association could decide on the type and size of lettering. YCA, not the city, proposed the use of the wing logo.

¶ 40     Ellis also specified that the weekly affiliation fee was $179 and that it included mandatory, minimum insurance coverage of $350,000 per occurrence.

¶ 41     In an "Affiliation Agreement" between YCA and Zegus dated March 30, 2001, YCA agreed to license the use of its color scheme and its "Insignia," which are described as the service marks "Yellow Cab" and "Yellow." YCA reserved the right to give "final approval" regarding "shade and/or tone of the Colors on the Taxicab" and the "forms and locations" of YCA's insignia on the vehicle. The contract also states that each party is "an independent contractor and affirms that nothing contained herein shall be construed as creating any employer-employee, principal-agent, partnership, or joint venture relationship between [them]." Zegus apparently owned more than one Chicago medallion because seven years after affiliating with YCA in 2001, Zegus and "Yellow 1" entered into a "Medallion Only Purchase Agreement" on October 27, 2008, documenting Zegus's purchase of cab medallion No. 160 for $63,000.

¶ 42     In deposition testimony that was excluded from the trial, Moberg agreed that the municipality had not chosen the name "Yellow Cab Affiliation," had not chosen YCA's wing

logo, and had not chosen YCA's color scheme. The YCA color was a "unique and special shade of yellow" chosen through research at the University of Chicago when Yellow Cab began operating in Chicago in 1915, and it had been in use for many years by YCA and YCA's predecessor companies before the accident in 2005. Yellow Cab purported to be the oldest and largest taxicab company in North America, and according to Moberg, YCA had the largest fleet in Chicago, Flash had the second, and Checker had the third. Moberg recalled that in the mid-1990s he verbally asked "the commissioner" to include the actual license owner's name on the exterior of Checker Taxi Association affiliated vehicles, and he was uncertain whether he had also made a formal, written request at the time. He repeated the question in either 2002 or 2003 and was certain that this time was only a verbal request. Moberg agreed that "having a fleet with a recognized emblem and color scheme helps with marketing to people who ride in cabs." Checker Taxi Association and its immediate predecessor Checker Taxi Company did not own the color scheme and logo they used on Chicago cabs and instead paid a licensing fee for their use. Moberg was uncertain whether YCA owned its color scheme and logo but said "I would think not" because YCA "is a relatively new entity."

¶ 43 Rupal Bapat was not called as a trial witness. At her evidence deposition, Bapat indicated that in 2011 she was promoted to the position of deputy commissioner of the division of public vehicle operations of the department of business affairs and consumer protection (BACP) of the city of Chicago. Between 2011 and 2005, she was an assistant commissioner with the same department, and between 1998 and 2005, she was a staff attorney with the department. In the staff attorney position, she prosecuted violations of the Code at issue, section 9-112.

¶ 44 Bapat described taxicab affiliations as being similar to a franchise, in that the affiliation would be formed and licensed and then taxicab licensees would choose to "belong to it" or not. She said Chicago's taxicab industry is a "highly regulated business," and she characterized the Code's control over a taxicab's appearance as "bumper to bumper."

¶ 45 Bapat also said, however, that YCA chose its own distinctive color and the municipality had no input into the design or creation of YCA's logo. Bapat knew that YCA's iconic color and logo predated her tenure with the municipal department. (Bapat came to work for the department in 1998.) She thought that the color scheme and logo had been used by Yellow Cab for "many years," and she referred to the color scheme and logo as being "so old." She also assumed that it was "sometime ago," that "Yellow Cab" had been chosen "as their corporate legal name."

¶ 46 Bapat was questioned about the advertising signs and devices permitted by section 9-112-300 of the Code (Chicago Municipal Code § 9-112-300 (amended July 12, 1990)) ("Advertising signs permitted when")). She indicated the city regulates the specific placement on the exterior and interior of taxi logos, emblems, phone numbers, and any advertising. The medallion owner applies online and pays a fee for advertising permits and inspections. Permits are then approved as long as the advertising does not obscure the vehicle's identifying information. The advertising equipment must be securely attached so it does not cause a safety issue. Advertising permits can be issued for taxi top hoods, exterior door panels, and interiors. Chicago Department of Business Affairs and Consumer Protection Rule 14.04 ("Advertising guidelines"), which was part of the rules and regulations that BACP adopted in furtherance of the Code, prohibits profanity or other offensive advertising content.

¶ 47 Bapat confirmed that section 9-112-390 of the Code (Chicago Municipal Code § 9-112-390 (amended Nov. 15, 2000)), which dictates the location and size of a taxi's license

number and driver information, prohibits displays which are not required by the Code or by state law, or displays which are not permitted by the Code. Bapat also said "[A]nybody can apply for whatever they want [to display]. I mean, I don't think that there's a bar on asking for something." With respect to interior displays, Bapat said the rules specified the minimum display of information and indicated anything else needed approval, but there was no prohibition on seeking or getting approval to display information regarding independent ownership and operation. Applying to the exterior the words "owned and operated by" and the medallion owner's name would probably have to be approved by BACP, but Bapat specified, "I don't have knowledge of anybody ever asking" for approval of that phrase. There was also nothing in the Code or rules that would prevent someone from asking to use an audible announcement that a cab is owned and operated by an independent contractor.

¶ 48    Cometas Dilanjian, a co-owner of City Service Taxi Association, was another potential witness who was not called to testify before the jury. At his deposition, Dilanjian said he became involved in the taxicab industry as second-generation driver in 1978, subsequently became a manager, a broker, and a lender within the industry, and had been a taxi affiliation co-owner for 10 years. Dilanjian recalled having two or three conversations between 1997 and 2000 with the then-commissioner of the department of consumer services, Caroline Schoenberger. (Bapat testified that the department of consumer services merged into BACP.) Schoenberger convened informal meetings at least every other month with medallion owners, affiliation representatives, and drivers. Section 9-112-390 of the Code (Chicago Municipal Code § 9-112-390 (amended Nov. 15, 2000)) controlled the appearance of cabs and limits the exterior to the affiliation's color scheme, trade name, or emblem and telephone number. Dilanjian, Moberg, and some other operators suggested changing the Code to authorize placing the names of the owner/operators on the side of taxicabs, as they had seen done with some suburban taxicabs, but Schoenberger denied the request. When the request was repeated at a subsequent meeting, she again rejected it.

¶ 49    Before granting the Jacobses' motion *in limine* No. 23, the trial court read the proposed testimony from Ellis, Moberg, Bapat, and Dilanjian, as well as the Code, and the Affiliation Agreement between YCA and Zegus, but reasoned that evidence regarding the "actual legal status" that was "generated by ordinance or by contract or agreements or practice" was not relevant to the case and was collateral to the issue of apparent agency. The pertinent questions were of appearance and reasonable, detrimental reliance. "So these witness may have something to say on relevant subjects, but to defend *** by pointing to an ordinance or by pointing to the City and pointing to the heavy regulations that evidently take place in this industry would take the Jury on a frolic that's not relevant."

¶ 50    Based on the cases cited above, the Code regulating Chicago's taxicabs, and the proffered testimony of the four witnesses, we conclude that the trial court did not abuse its discretion in granting the Jacobses' motion *in limine* No. 23. The proposed testimony suffers from several defects, the most obvious being that it was not relevant to the issues in the case because it did not negate the fact that the appearance of Ezeagu's cab was determined by YCA. The municipal code which YCA attempted to interject into the proceedings did not dictate that YCA choose a particular color scheme or logo, and the deposition testimony indicated YCA chose to use the same distinctive color scheme and nearly the same logo that was used historically by its predecessor, Yellow Cab Company, when the company owned a large fleet of taxicabs and had an employer-employee relationship with its cab drivers. YCA has argued

- 14 -

that cab No. 160's appearance was not voluntary and was instead mandated by the local ordinance. But in fact, the ordinance never required YCA to use its predecessor's color scheme and its trade name or emblem.

Section 9-112-010(a) of the version of the ordinance that was in effect at the time stated:

" 'Affiliation' means an association of public passenger vehicle license holders organized and incorporated for the purpose of providing its members with a Chicago business address, telephone number registered to the affiliation, color scheme where applicable, a trade name or emblem where applicable, a two-way radio dispatch system, insurance and the designation of an authorized registered agent. Members of an affiliation shall be known as 'affiliates.' " Chicago Municipal Code § 9-112-010(a) (amended Nov. 15, 2000).

Section 9-112-080(b)(7) regarding the "Qualifications" of a public passenger vehicle license holder required most taxis to affiliate with a licensed affiliation:

"7. Beginning January 1, 1999, any applicant for issuance or renewal of a taxicab license shall submit proof that he is affiliated with an affiliation licensed by the city, except that a licensee who certifies at the time of application that he/she owns or controls no more than one taxicab license and that no person other than the licensee, the licensee's spouse or a natural or legally adopted child of the licensee shall operate the taxicab throughout the entire license period need not be affiliated." Chicago Municipal Code § 9-112-080(b)(7) (amended Nov. 15, 2000).

In addition, section 9-112-390 stated at the time:

"Every taxicab shall have the public passenger vehicle license number and the cabman's name and telephone number painted [on the rear doors, or if an advertising permit has been issued for the rear doors, then on the rear panels of the vehicle]. If the cabman is affiliated or identified with any affiliation, *** the affiliation's color scheme, trade name or emblem and telephone number shall be [painted on the rear doors or rear panels] and, without being limited thereto, any of these indicia of affiliation shall be sufficient to establish the responsibility of the affiliation in the operation of the taxicab. All names and numbers shall be painted in plain Gothic letters and figures of one-half-inch [stroke] and at least four inches in height. The public vehicle license number assigned to any taxicab shall be assigned to the same vehicle or to any vehicle substituted therefor by the licensee. The commissioner may also provide, pursuant to rule, that other information of interest to the public, including, but not limited to, the licensee's or affiliation's website or email address and/or the current taximeter rates of fare be permanently and prominently affixed to the outside of the vehicle. No other name, number, emblem, or advertisement of any kind except signs required by this chapter [9-112 of the Municipal Code which governs Public Passenger Vehicles], official license emblems or metal plate shall be painted or carried so as to be visible on the outside of any taxicab unless otherwise required by state law." Chicago Municipal Code § 9-112-390 (amended Nov. 15, 2000).

Thus, although the ordinance spoke of an affiliation's color scheme, its trade name or emblem, and its telephone number, none of the language dictated or narrowed YCA's identifying characteristics. It was YCA that decided that YCA-affiliated cabs would be covered in the same distinctive shade of yellow which had covered Yellow Cab's ubiquitous fleet when it owned the vehicles and employed the drivers. And it was YCA that wanted to use

essentially the same yellow wing logo with the words "Yellow" and "Cab" still featured most prominently and the small phrase "Affiliation, Inc." tucked nearly imperceptibly into the border of the historical logo, in very small lettering:



¶ 55    YCA cites section 9-112-390 for the proposition that its appearance was based on legally mandated conduct and that it was error to allow the Jacobses to proceed on and recover on a theory that YCA made voluntary choices which created the appearance of agency with Ezeagu. No part of section 9-112-390 limited YCA's choice of identifying characteristics. No Code section or corresponding BACP rule specified a particular color or even narrowed YCA's choice of color(s). No regulation required affiliations to cover the entire exterior of cabs in the affiliation's identifying color(s) as Yellow Cab Company historically covered its vehicles. The all-over coloring of cab No. 160 contrasts with the small and strategic placement of color on the white vehicles that other cab affiliations chose (as depicted in the 20 photos introduced during Moberg's deposition and tendered in opposition to motion *in limine* No. 23). Also, no Chicago ordinance or rule mandated that YCA adopt a particular logo.

¶ 56    YCA's choice of identifying characteristics is material because that choice is what created the appearance that Ezeagu was YCA's agent. YCA could have chosen nearly any color scheme and logo. It could have used a color scheme and logo that was derivative of, yet sufficiently different from, Yellow Cab's to announce YCA's presence in Chicago. However, YCA chose not to modernize the vehicle appearance to reflect the modern relationship that YCA has with cab owners and drivers. YCA's liability to the Jacobses is not based on its involuntary compliance with the Code, as it now argues, but on its affirmative and voluntary choice, independent of any legal requirement, of a certain color scheme and logo. Adopting the well-known and recognizable Yellow Cab appearance was not required by the municipality. Rather, the prospective customer's perception that Yellow Cab Company was still a unified, monolithic brand was the result of YCA's own volitional marketing and design decisions. We are unpersuaded by YCA's assertion that there was "simply no way for [it] to modify its conduct or otherwise limit its exposure." It is clear to this court that by continuing to present nearly the same appearance over the years, YCA knew that prospective customers, including Jacobs, would believe YCA owned and/or controlled the distinctive yellow-colored cabs that were operating in Chicago.

¶ 57    YCA also wanted to present Moberg, Dilanjian, and Bapat's testimony to show that the city prevented cab owners and drivers from informing the public of their independence from YCA. This argument is about marking the cab with the medallion owner's name and the phrase "Independently Owned and Operated" and is based on the concluding sentence in section 9-112-390, quoted above, which prohibits additional displays of information which are not required by the ordinance, approved by BACP, or required by other law. Moberg and Dilanjian were presidents of two other taxicab affiliations, not YCA, and Bapat was a long-term

employee of Chicago's BACP and had been promoted in 2011 to deputy commissioner. Moberg said that he made "several" requests to "the commissioner" to include the actual license owner's name on the exterior of Checker affiliated vehicles. Dilanjian was more specific and said:

> "Myself and some of the other operators, John [Moberg], being one of them, had brought that up [during an informal meeting with then-Commissioner Schoenberg], you know. We had seen that on suburban taxis, and we thought it would be a good idea to also have those on our affiliate taxis, whereby you're identifying the owner of the actual medallion.
>
> And just because [cabs appear to be owned and operated by] *** City Service [Taxi Association], or any other affiliation, the public is mistaken that they belong to us, which is not the case."

¶ 58 Dilanjian also said that affiliation owners were interested in painting the medallion owner's name on the exterior of each cab because, "from our perspective, you know, it would identify that it was an individual *** besides City Service, that owned the vehicle."

¶ 59 We point out that Moberg and Dilanjian's testimony indicates that even these lay individuals in Chicago's cab industry were aware that consumers did not understand that Chicago's historical cab companies had shifted away from direct ownership and employment to the affiliation relationship with Chicago's medallion owners and drivers. Apart from its hearsay nature, this proposed testimony suffers from other defects which justified barring it from the trial. The first infirmity is that none of the testimony was about YCA. Neither Moberg nor Dilanjian could speak for YCA because they were part of the management teams of other cab affiliations, not this defendant affiliation, and neither could competently testify whether YCA ever considered using cab No. 160's exterior to give notice that the vehicle and medallion were under independent ownership and operation. The fact that other cab affiliations may have wanted to clear up the public's misperception of the true legal relationship between their affiliations and their associated medallion owners and drivers is not an indication that YCA ever wanted to do the same. Furthermore, the Code did not provide for oral requests and neither Moberg nor Dilanjian could produce a record of a written request. Bapat's testimony was also nonspecific to YCA and was primarily "about her own experience enforcing the Code and regulations." Thus, the proposed testimony regarding the Code would have taken the jury's attention far from the relevant question of whether YCA's voluntary conduct created the appearance that this cab driver was its agent. The trial court aptly characterized the proposed evidence as a "frolic" off into territory that was not a defense to the Jacobses' allegations against YCA. The statements were not connected to YCA, and they were properly barred as irrelevant. *Clemons*, 292 Ill. App. 3d at 251, 684 N.E.2d at 1350 (irrelevant testimony is not admissible). Furthermore, even if the ordinance was in any way relevant, its introduction into the trial would have confused the issues and misled the jury into believing that YCA's selection of its yellow color scheme and wing logo was the result of a mandatory municipal ordinance, when in fact, there never was such a requirement. *Demos*, 317 Ill. App. 3d at 53, 740 N.E.2d at 18 ("even if the evidence is arguably relevant it may still be excluded if it would confuse the issues or tend to mislead the jury").

¶ 60 An additional problem with permitting the introduction of Moberg and Dilanjian's testimony at trial is that it was remote in time from Jacobs's decision to catch a cab on that August evening in 2005. Moberg purportedly asked "the commissioner" once in the 1990s and

"maybe" again in "2002, 2003" to include the actual license owner's name on the exterior of affiliated vehicles, and Dilanjian was only able to narrow down the time frame of the industry meetings with then-commissioner Schoenberger to perhaps two or three conversations somewhere between 1997 and 2000. Thus, their proposed testimony concerned the state of the Code at least several years before the accident, making it too stale and remote in time to have any evidentiary value. *Illinois State Toll Highway Authority v. Grand Mandarin Restaurant, Inc.*, 189 Ill. App. 3d 355, 363, 544 N.E.2d 1145, 1150 (1989) (rejecting 5-year-old purchase price and 10-year-old written and oral lease agreements as being too remote in time to have evidentiary value in real estate condemnation value dispute); *Healy v. Bearco Management, Inc.*, 216 Ill. App. 3d 945, 958, 576 N.E.2d 1195, 1205 (1991) (offer of proof that witness refused to give plaintiff money ten years earlier and thus harbored ill feelings towards plaintiff would have been too remote in time to aid the jury in weighing the witness's testimony); *Magna Bank of McLean County v. Ogilvie*, 235 Ill. App. 3d 318, 327, 601 N.E.2d 1091, 1097 (1992) (where railroad accident expert witness testified train crew should have blown whistle immediately, proposed evidence that he acted inconsistently 10 years earlier when he was the engineer on a train that rear-ended a second train was too remote in time).

¶ 61    Bapat, an attorney with the agency since 1998, could not corroborate Moberg or Dilanjian's testimony and undermined it when she said she was unaware the city had received an application to display ownership on the exterior of a Chicago cab. In addition, she conceded that the Code did not mandate any particular color, name, or logo.

¶ 62    Ultimately, none of the excluded testimony contradicts the fact that YCA voluntarily determined the appearance of the vehicle Ezeagu was driving. We find that the trial court did not err in rejecting the testimony and disallowing a mini-trial on the irrelevant municipal taxicab regulations.

¶ 63    YCA's offer of proof indicates that it also proposed to describe or provide the jury with the YCA-Zegus affiliation contract, taxicab regulations that were adopted by seven Illinois communities near Chicago (Buffalo Grove, Des Plaines, Elgin, Evanston, Morton Grove, Palatine, and Skokie), and the photographs of suburban cab logos. YCA does not argue these additional exhibits on appeal and has waived our consideration of them. *Doolin v. K-S Telegage Co.*, 75 Ill. App. 3d 25, 28, 393 N.E.2d 556, 559 (1979) (an appellant who fails to argue an issue waives it); Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) (supreme court rule indicating that points not argued on appeal are waived). In any event, not one piece of these additional materials contradicted the fact that the appearance of Ezeagu's cab was determined by YCA, in that YCA chose to use Yellow Cab's distinctive name, color scheme, and logo.

¶ 64    YCA's reliance on *Daniels* is misplaced because that plaintiff relied on an entirely different legal premise, actual agency, and argued that the extent of the principal's actual control over the driver and vehicle, which was dictated in part by the Code, created an actual principal-agent relationship. *Daniels*, 382 Ill. App. 3d 66, 886 N.E.2d 1193. Actual agency consists of a principal/agent, master/servant, or employer/employee relationship and the principal's control or right to control the conduct of the agent, servant, or employee. See *Oliveira-Brooks*, 372 Ill. App. 3d at 134, 865 N.E.2d at 258. Apparent agency liability occurs when a purported principal has created the appearance that someone is his or her agent, and an innocent third party has reasonably relied on the appearance to his or her detriment. *O'Banner*, 173 Ill. 2d at 213, 670 N.E.2d at 634. The *Daniels* court did not address the concept at issue here, apparent agency, and the Jacobses' contention that YCA's voluntary marketing decision

to use a historic, recognized color scheme and logo created the reasonable impression that a Yellow Cab was being driven by a Yellow Cab driver under Yellow Cab's authority and control. In other words, the plaintiff in *Daniels* relied on the Code and the real relationship between the affiliation and the driver, while the Jacobses did not. The Code and the principles of actual agency are red herrings that were introduced in these proceedings by the defendants.

¶ 65        YCA's reliance on *Knapp* and *Oliveira-Brooks* is similarly misplaced, as the first case is strictly an actual agency case, and the second case is primarily an actual agency case that touches only briefly on the apparent agency concept and indicates the plaintiff failed to plead two of the three elements of this type of claim. *Knapp v. Hill*, 276 Ill. App. 3d 376, 657 N.E.2d 1068 (1995); *Oliveira-Brooks*, 372 Ill. App. 3d 127, 865 N.E.2d 252. In addition, *Sebago v. Boston Cab Dispatch, Inc.*, 28 N.E.2d 1139 (Mass. 2015), cited by *amicus curiae* TLPA, is a variation on *Daniels*, in which four Boston cab drivers argued that compliance with municipal taxicab regulations meant that instead of being independent contractors, they had become actual employees entitled to minimum wages, overtime pay, and other benefits. Not one of these cases is on point, and the courts' conclusions cannot be applied to the current litigation. As in the trial court, YCA continues to rely on the concept of actual agency, when the only agency principle relevant in this case is the concept of apparent agency.

¶ 66        Furthermore, we reject YCA's contention that, as a matter of law, the taxicab medallion owner's license (hard card) posted inside the vehicle put Jacobs on notice that the cab was not owned by YCA and thus he could not have reasonably relied on the cab driver being an apparent agent of YCA. See *Oliveira-Brooks*, 372 Ill. App. 3d at 137, 865 N.E.2d at 260 (indicating the elements of apparent agency are that the principal held the agent out, the third person reasonably concluded that an agency relationship existed, and the third person relied on the agent's apparent authority to his detriment).

¶ 67        The significance of the hard card is not an issue which could or should have been resolved by the trial court as a matter of law. The decision YCA primarily relies upon, *York*, involved a jury trial. *York*, 222 Ill. 2d at 202, 854 N.E.2d at 665-66 ("if a patient is placed on notice of the independent [contractor] status of the medical professionals [at the hospital], it would be unreasonable for a patient to assume that these individuals are employed by the hospital" and the patient cannot argue "there was an appearance of agency between the independent contractor and the hospital"). Here, too, it was for the jury to decide whether the content of the card and the manner in which it was displayed gave sufficient notice to a reasonable person in Jacobs's position. See *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 36, 719 N.E.2d 756, 767 (1999). The existence of the hard card alone does not establish that Jacobs was notified that Ezeagu was not YCA's agent.

¶ 68        Accordingly, we conclude that the trial court did not abuse its discretion in granting the plaintiffs' motion *in limine* No. 23 to bar evidence that was irrelevant and would not have made a difference in the jury's determination as to whether YCA was the apparent principal of the cab driver. It was not an abuse of discretion to bar evidence YCA proffered to suggest that the ordinance mandated the selection of YCA's color scheme, name, and logo on the side of Ezeagu's cab. It was not, as YCA argues, an involuntary decision on YCA's part to choose the iconic name, color, and logo of the once largest cab company in Chicago.

¶ 69        In addition, the trial court did not abuse its discretion in refusing to let YCA introduce evidence that the ordinance would not permit an affiliation to place anything other than the specific medallion number and the affiliation's logo and phone number on the exterior of the

cab. Even though one could argue that the ordinance in effect at the time generally did not allow information such as "independently owned and operated [by another]" to be placed exterior of the cab, (1) there was other proffered testimony indicating that an application could have been made to add that information, and (2) the only witness who provided any competent evidence in this regard was Bapat, who averred that she did not recall the department ever receiving and rejecting such an application. As already discussed above, there was no particular relevance about some other cab affiliation's request, made many years before this accident, that the other affiliation be permitted to post ownership information on the side of its affiliated vehicles. Moberg and Dilanjian's proposed testimony was obviously remote, uncertain, and speculative *vis-à-vis* YCA. Furthermore, the trial court could reasonably conclude that the testimony's limited relevance would mislead and confuse the jury on the issue of whether YCA held out Ezeagu as its agent. Since YCA never requested that the city allow YCA to place ownership information on YCA-affiliated cabs, YCA has not demonstrated how the evidence would have impacted the jury's decision about YCA or how the jury could have used the purely speculative information to reach its verdict about YCA. Furthermore, as the appellant, YCA would need to show not only that the proposed evidence was improperly excluded but also that the exclusion resulted in serious prejudice which affected the outcome of the trial. *Jones v. DHR Cambridge Homes, Inc.*, 381 Ill. App. 3d 18, 33, 885 N.E.2d 330, 344 (2008) (a reviewing court will grant reversal based on evidentiary rulings only when the error was substantially prejudicial and affected the outcome of the trial); *Bachman v. General Motors Corp.*, 332 Ill. App. 3d 760, 785, 776 N.E.2d 262, 285 (2002) (burden is on the party seeking reversal to establish that an evidentiary ruling was erroneous, substantially prejudicial, and affected the outcome of the trial). YCA has not argued how this independent ownership evidence would have precluded an apparent agency finding in this case. Accordingly, we find no abuse of discretion on this ground. *Schwartz*, 177 Ill. 2d at 176, 685 N.E.2d at 1074 (indicating a trial court abuses its discretion when no reasonable person would reach the same decision).

¶ 70    The dissent correctly states that Chicago's taxicab industry is a highly regulated field. However, the dissent concedes, as it must, that the Code did not require YCA to choose the distinctive and historical yellow color, Yellow Cab name, and wing logo which manifested an agency relationship between YCA and Ezeagu. Again, those choices were YCA's voluntary choices and voluntary manifestations of its agency relationship with the cab driver. If the regulations had in any way required YCA to use its predecessor's color scheme on the 1,500 or 2,500 cabs that affiliated with YCA (both numbers appear in the record), we would agree that the jury should have heard this evidence and then been asked to decide whether YCA was involuntarily complying with the Code or voluntarily holding out Ezeagu. Moreover, if there was any witness testimony to that effect, we would agree that the jury should have heard it. If the Code required YCA to select a name such as "Yellow Cab" and place it in large, prominent lettering on its affiliated vehicles, then the jury should have been asked to consider whether YCA had any choice but to display the name of a former giant employer of Chicago taxicab drivers. No Code section and no proposed witness testimony, however, suggested that YCA should select the name it selected. Similarly, if the Code required YCA to nearlyreplicate the former giant's logo, then the jury should have decided whether the ordinance mandated the choice or YCA made that choice voluntarily. However, there was no such provision in the Code and no possible witness testimony to that effect. We cannot fault the trial court for

properly excluding YCA from portraying YCA's voluntary acts as involuntary, without any legal or evidentiary support.

¶ 71 Although the dissent accurately describes many parts of the ordinance, no part of the "bumper to bumper" regulations makes it more probable that YCA involuntarily selected its particular color scheme, name, and logo. It is impossible to conclude that requiring all cabs to have dome lights, use a minimum size of Gothic font lettering, or transport riders in underserved neighborhoods made it more probable that YCA's selection of its full-cab color scheme, name, and logo were involuntary acts. Requirements about vehicle appearance, such as certain cab lighting and the font size of signage, had no bearing on whether YCA manifested to the public that YCA was Ezeagu's principal. In fact, YCA itself does not argue on appeal that any specific Code section should have been presented to the jury. Furthermore, Bapat, one of YCA's own proposed witnesses in opposition to the motion *in limine*, emphatically said (1) "I know that the color yellow that Yellow Cab uses is the color that they've chosen," (2) YCA chose its corporate name, and (3) YCA's insignia was the same insignia she had seen on taxicabs throughout her career dating to 1998, which was prior to YCA's formation. Regulations about vehicle appearance helped make cabs uniform and clearly identifiable as cabs to Chicago consumers. YCA knew that once YCA made its choices, the Code would require affiliated medallion owners to consistently use those visible manifestations of agency. The ordinance did not control YCA's decisions to portray affiliated vehicles in a certain way to consumers. Furthermore, it is unpersuasive to suggest that the city's decision to break up the ownership of medallions from a few companies to many somehow controlled YCA's choice of how its affiliated cabs would appear to the public.

¶ 72 In addition, the dissent's suggestion that YCA is in business to help the city regulate Chicago taxicabs is misplaced. The record reveals that YCA collects roughly $200 per week per affiliated cab, whether the cab is driven or not, which amounts to millions of dollars per year. Although some of that steady stream of income is used to provide the affiliated medallion owners with liability insurance coverage and other services such as complimentary car washes, it is indisputable that YCA is a for-profit business. YCA is not a charity serving the Chicago community, nor has it been required to remain in the taxicab industry.

¶ 73 The dissent also finds it significant that the ordinance requires affiliations and affiliates (YCA and medallion owners) to enter into written contracts. We have already concluded that YCA did not sufficiently explain in its appellate brief how and in what way the jury should have been informed about the agreement. YCA has not argued on appeal that any of the agreement's provisions were crucial to its defense or that YCA was prejudiced by the agreement's absence from the proceedings. We found the incomplete argument was waived. The dissent, nevertheless, deems the argument to have been important.

¶ 74 The dissent also highlights the fact that as the trial began, the plaintiffs dismissed the medallion owner (the driver's brother) as a defendant, as was the plaintiffs' right. This fact has no bearing on the evidentiary rulings on appeal.

¶ 75 We have also separately examined whether the trial court should have allowed evidence that the ordinance prohibited YCA from telling the public that cab medallion No. 160 was independently owned and being operated by another person or entity. Although Bapat said at her deposition that the ordinance strictly regulated what had to be displayed on the interior and exterior of the cab, she also said nothing prohibited a request to display additional information on the vehicle and that she was unaware of anyone ever presenting such a request or having it

rejected. YCA has never argued that it made such a request. Instead, YCA proposed to put on testimony that some other cab company or companies, wholly unrelated to YCA, and many years before the accident at issue, had orally made a request during a meeting with the then-Commissioner, and that she denied it. As we noted above, there was no evidence or testimony to corroborate this proposed testimony. Furthermore, the Code does not provide for oral requests. And, even assuming that the proposed testimony was accurate, no one testified that YCA was aware that such a conversation took place. Consequently, we cannot conclude from YCA's thin offer of proof that the trial court's ruling was an abuse of discretion.

¶ 76    Finally, the dissent is persuaded by YCA's inaccurate contention that YCA "had no authority under the Code to reject an affiliate" such as corporate medallion owner Zegus and is nevertheless being held responsible for the driver's accident. The dissent cites this as another instance of YCA's involuntary conduct mandated by the Code. YCA's only support for this contention, however, is section 9-112-080(b)(7) of the Code, which actually required Zegus to join an affiliation, because, at the time, Zegus owned more than one cab medallion and was leasing cab No. 160 to someone who was not an immediate family member of Matthew Ezeagu. Section 9-112-80(b)(7) imposed this requirement on medallion owners, but it did not impose any obligation on affiliations. Thus, YCA's reliance on the Code is incorrect. Furthermore, YCA's own witness, Ellis, who worked for Yellow Cab and YCA for many years, specified that his employer scrutinized both the medallion owner and driver before accepting a relationship with them. The inescapable conclusion from the record is that YCA did reject potential affiliates.

¶ 77    Unlike the dissent, we conclude YCA's manifestations of agency resulted from YCA's voluntary actions which were not forced upon it by the Code. We also determine that in this case, the apparent principal, YCA, did voluntarily control the appearance of agency.

¶ 78    The Code and *Daniels* are also YCA's basis for arguing that it was entitled to judgment as a matter of law and that the trial court erred by denying YCA's motion for a directed verdict and posttrial motion for judgment notwithstanding the verdict. These two decisions are reviewed *de novo. Williams v. BNSF Ry. Co.*, 2015 IL App (1st) 121901-B, ¶ 36, 29 N.E.3d 1097 (motions for directed verdict are reviewed *de novo*); *Kehoe v. Wildman, Harrold, Allen & Dixon*, 387 Ill. App. 3d 454, 462, 899 N.E.2d 1177, 1184 (2008) (motions for judgment notwithstanding the verdict are reviewed *de novo*).

¶ 79    However, the determination of apparent agency is generally not a question of law. *Oliveira-Brooks*, 372 Ill. App. 3d at 134, 865 N.E.2d at 258. Although the existence of an agency relationship can become a question of law when the "the facts regarding the relationship are undisputed or no liability exists as a matter of law" (*Oliveira-Brooks*, 372 Ill. App. 3d at 134, 865 N.E.2d at 258), that is not the case here. A directed verdict is appropriate only in those cases where all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could ever stand. *Williams*, 2015 IL App (1st) 121901-B, ¶ 36, 29 N.E.3d 1097. Similarly, a judgment notwithstanding the verdict should not be entered "unless the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." (Internal quotation marks omitted.) *Kehoe*, 387 Ill. App. 3d at 462, 899 N.E.2d at 1184.

¶ 80    Our analysis above indicates YCA was not entitled to judgment as a matter of law. As we have already pointed out, adopting the recognizable look of the historical yellow taxicab was

not in any way required by the municipal ordinance. Furthermore, *Daniels* does not suggest otherwise. *Daniels*, 382 Ill. App. 3d 66, 886 N.E.2d 1193. YCA's use of the historical color scheme and selection of the emblem, taken with the history of Yellow Cab Company in Chicago, were volitional manifestations which would be likely to play upon the expectations of this city's consumers and lead Jacobs to believe that the yellow cab he chose to ride in was a YCA vehicle, operated by a YCA driver, under YCA's authority and control. In light of the evidence, the jury correctly could and did conclude that YCA held out Ezeagu as its driver and that Jacobs reasonably relied on that holding out. Therefore, YCA was not entitled to judgment as a matter of law, either when it presented its motion for a directed verdict or its posttrial motion for judgment notwithstanding the verdict.

¶ 81    Having considered YCA's many contentions regarding the evidence and law pertinent to the Jacobses' apparent agency claims, we affirm the trial court's rejection of the Chicago ordinance and other irrelevant information which YCA attempted to use to undermine the plaintiffs' case. This conclusion resolves YCA's main argument.

¶ 82    YCA's next argument concerns the jury instructions as to apparent agency. YCA argues the trial court ignored the drafting committee's notes stating that Illinois Pattern Jury Instructions, Civil, No. 105.10 (2011) (hereinafter, IPI Civil (2011) No. 105.10) should not be used in cases other than medical negligence without modification, and that the instruction was not sufficiently revised to suit the facts of this case. The trial court changed the instruction to reflect that this case involved a taxicab affiliation, not a hospital, and the court also broke up the paragraphs to reflect the three elements of apparent agency. Instruction No. 105.10, as modified by the trial court and given to the jury, reads:

> "In order for an apparent agency relationship to have existed, Marc Jacobs must prove the following:
>
> First, that Yellow Cab Affiliation, Inc. held itself out as a provider of taxicab services;
>
> Second, that Marc Jacobs neither knew nor should have known that Cornelius Ezeagu was not an employee of Yellow Cab Affiliation, Inc.; and
>
> Third, that Marc Jacobs did not choose Cornelius Ezeagu but relied on Yellow Cab Affiliation, Inc. to provide taxicab services."

YCA contends the modified instruction, however, did not require the Jacobses to prove the core elements of apparent agency, a nonpattern instruction would have been appropriate, and YCA must have a new trial.

¶ 83    The Jacobses respond that the instruction was proper because the pattern instructions contemplate that IPI Civil (2011) No. 105.10 will be used with modification in nonmedical negligence cases. Also, the pattern instruction for general apparent agency, IPI Civil (2011) No. 50.16, expressly indicates that the drafting committee "prepared instructions dealing with these issues which can be found at 105.10 and 105.11." IPI Civil (2011) No. 50.16, Comment. The Jacobses further assert that substantial modifications were made to IPI Civil (2011) No. 105.10 at the defendants' request and that the instruction did require the Jacobses to prove the three elements of their claims. Recognizing that the particular pattern instruction was first drafted for use in medical negligence cases, the trial court modified the language so that it pertained to the taxicab industry instead of the medical industry. At the court's jury instruction conference with counsel, the court granted YCA's request that the three elements in the

instruction be broken out into three paragraphs, instead of the two in the standard pattern instruction, so that the jury would be aware that in order to find an apparent agency relationship, it would need to find that Jacobs neither knew nor should have known that Ezeagu was not YCA's agent. Furthermore, at YCA's request, the jury was given a special interrogatory as to each of the three elements, and the jury answered the questions consistently with the general verdict, which indicates that the jury clearly understood the instructions. The Jacobses also contend that YCA's posttrial motion was insufficient to preserve the current argument.

¶ 84    The trial court exercises its discretion to determine if a proposed jury instruction is applicable, supported by evidence in the record, and an accurate statement of the law. *Luye v. Schopper*, 348 Ill. App. 3d 767, 773, 809 N.E.2d 156, 161 (2004). Once a trial court determines an instruction is to be given, then Illinois Supreme Court Rule 239(a) (eff. Jan. 1, 1999) creates a presumption that one of the pattern instructions will be used. *Luye*, 348 Ill. App. 3d at 773, 809 N.E.2d at 161. The trial court does not abuse its discretion by refusing a nonpattern instruction if an appropriate pattern instruction exists. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 285, 775 N.E.2d 964, 979 (2002). The trial court may reject a pattern instruction that does not correctly state principles of law applicable to the submitted evidence. Ill. S. Ct. R. 239(a) (eff. Jan. 1, 1999). On review, we may look to whether the challenged instruction " 'fairly, fully, and comprehensively apprised the jury of the relevant legal principles.' " *Luye*, 348 Ill. App. 3d at 773, 809 N.E.2d at 161 (quoting *Schultz*, 201 Ill. 2d at 273-74, 775 N.E.2d at 973).

¶ 85    However, in order to preserve for review a question concerning jury instructions, the appellant must have filed a sufficiently specific posttrial motion. *Brown v. Decatur Memorial Hospital*, 83 Ill. 2d 344, 415 N.E.2d 337 (1980). Pursuant to the Code of Civil Procedure, a posttrial motion "must contain the points relied upon, particularly specifying the grounds in support thereof, and must state the relief desired." 735 ILCS 5/2-1202(b) (West 2014). Subsequently, pursuant to the rules governing appeals, "A party may not urge as error on review of the ruling on the party's post-trial motion any point, ground, or relief not specified in the motion." Ill. S. Ct. R. 366(b)(2)(iii) (eff. Feb. 1, 1994). Specificity is required in a posttrial motion for three reasons: (1) to allow the trial judge, who is most familiar with the trial proceedings, to review his or her decisions without the pressure of an ongoing trial and grant a new trial if the challenged decisions were incorrect, (2) to allow a reviewing court to determine from the record whether the trial judge was adequately afforded an opportunity to reassess the rulings, and (3) to prevent a party from stating mere general objections in the trial court and subsequently raise on appeal specific arguments which the trial judge was never given the opportunity to consider. *Brown*, 83 Ill. 2d at 349-50, 415 N.E.2d at 339.

¶ 86    Typically, when a posttrial motion is presented, the jury instruction conference has not yet been transcribed and, rather than expecting the trial judge to recall the details of the conference, the motion must convey enough detail to give the judge the ability to make an informed decision about his or her earlier rulings. *Brown*, 83 Ill. 2d at 350-51, 415 N.E.2d at 340. Accordingly, in *Brown*, the court deemed the following posttrial argument to be clearly inadequate under both the statute and rule quoted above: " 'The Court refused to give Plaintiff's tendered instructions 9, 11, and 16' " and " 'The court gave, over objection of the Plaintiff, Defendant's tendered instructions 2, 3, and 4.' " *Brown*, 83 Ill. 2d at 349, 415 N.E.2d at 340.

- 24 -

¶ 87    In our opinion, YCA's posttrial motion was very similar to the posttrial motion that was rejected in *Brown* (*Brown*, 83 Ill. 2d 344, 415 N.E.2d 337), and it defied the specificity requirements of the statute and rule quoted above. YCA's posttrial motion stated only the following:

> "The Defendant tendered numerous alternative instructions on the subject of apparent agency, all of which were rejected by the Court, even though they nearly identically tracked the language of the nonmedical malpractice cases on apparent agency cited by Defendants in their Apparent Agency Brief and related arguments thereon.
>
> The Court disallowed each and every jury instruction about apparent agency, including the definition of apparent agency from Plooy[2] [*sic*] with the elements of acquiescence or knowledge by the principal. The Court rejected all of Defendant's instructions that sought to explain or define holding out or reliance. All of the foregoing constitutes error and justifies a new trial."

¶ 88    YCA disagrees with the Jacobses' remark that the posttrial motion was "hastily" filed before it was complete. The procedural rules give a party 30 days after the entry of a judgment or the discharge of a jury to file a posttrial motion, and the trial court is authorized to extend this deadline. 735 ILCS 5/2-1202(c) (West 2014). However, a posttrial motion filed in apt time stays enforcement of the judgment. 735 ILCS 5/2-1202(d) (West 2014). YCA acknowledges filing its posttrial motion almost immediately after the jury's verdict, but contends the motion was adequate and that the Jacobses said at the time that the motion presented arguments which the trial court could rule on immediately without waiting for the parties to prepare briefs.

¶ 89    Regardless of the Jacobses' willingness to proceed without further argument or briefing, it was incumbent on YCA, as the moving party, to prepare a written motion which was sufficiently detailed to preserve YCA's arguments for review. We find that YCA did not make a record adequate to preserve the issue of jury instructions for our review, which is reason for us to affirm the trial court's ruling. *Brown*, 83 Ill. 2d at 352, 415 N.E.2d at 341.

¶ 90    Even if we deemed the posttrial motion sufficient, in our opinion, the instruction that was given accurately stated the law and fully apprised the jury of the legal principles of apparent agency relevant in this case. We are mindful that this instruction was developed for medical negligence cases, however, as the Jacobses pointed out, it is clear from the drafting committee's notes that it contemplated that the instruction would be used in other types of cases and modified accordingly. The trial court modified the pattern instruction to reflect the nature of the case and made further changes that YCA proposed. YCA contends that some other instructions were appropriate, but YCA has not established that the modified instruction was legally deficient. Therefore, even on the merits, we are not persuaded that the trial court abused its discretion by instructing the jury as it did.

¶ 91    We now turn to the last element of an apparent agency claim, which is that the third party relied to his detriment on the agent's apparent authority. *Oliveira-Brooks*, 372 Ill. App. 3d at 137, 865 N.E.2d at 260; *O'Banner*, 173 Ill. 2d at 213, 670 N.E.2d at 635 ("In order to recover on an apparent agency theory, O'Banner would have to show that he actually did rely on the apparent agency in going to the [McDonald's] restaurant where he was allegedly injured."). YCA now contends the Jacobses' claim against YCA must fail as a matter of law because there was no evidence as to why Jacobs chose cab No. 160 on the night of the accident. The Jacobses

---

[2]This is apparently a reference to *Plooy v. Paryani*, 275 Ill. App. 3d 1074, 657 N.E.2d 12 (1995).

respond that his reliance was established through testimony indicating he had a habit of taking YCA cabs because he believed they were cleaner and safer than other taxicabs.

¶ 92    Evidence of reliance on other occasions is not sufficient to prove reliance on the occasion at issue. *Plooy v. Paryani*, 275 Ill. App. 3d 1074, 1087, 657 N.E.2d 12, 22 (1995) (customer's reliance on a Checker cab advertisement on previous occasions was "completely irrelevant if the plaintiff did not rely upon the advertisement on the night in question"). It is the plaintiff's burden to produce sufficient evidence of each element of the cause of action. *Nolan v. Weil-McLain*, 233 Ill. 2d 416, 430, 910 N.E.2d 549, 556 (2009). A plaintiff meets his burden of production as to a given element " 'when there is some evidence which, when viewed most favorably to the plaintiff's position, would allow a reasonable trier of fact to conclude the element to be proven.' " *Nolan*, 233 Ill. 2d at 430, 910 N.E.2d at 556 (quoting *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 354, 603 N.E.2d 449, 454 (1992)). A fact may be proven through circumstantial evidence when a reasonable inference can be drawn from the circumstances. *Caruso v. M&O Insulation Co.*, 345 Ill. App. 3d 345, 348, 802 N.E.2d 327, 330 (2003); *Walsh v. Dream Builders, Inc.*, 129 Ill. App. 2d 280, 287, 264 N.E.2d 247, 251 (1970) (defining circumstantial evidence as proof of facts or circumstances which give rise to a reasonable inference of the truth of the fact sought to be proved). Proof which relies upon mere conjecture or speculation, rather than reasonable inference, is insufficient. *Thacker*, 151 Ill. 2d at 354, 603 N.E.2d at 454.

¶ 93    In this case, Jacobs has no memory of why he got into cab No. 160 that night because he suffers from retrograde amnesia as a result of his brain injury. Therefore, it is impossible for him to present direct evidence that he relied on the appearance of authority in that instance. The Jacobses maintain, however, that reliance was demonstrated by habit testimony. The Jacobses presented evidence that he had a habit of taking YCA-affiliated taxicabs which stemmed from a bad experience with a Checker cab in the 1980s. Jacobs explained that he is "very risk adverse" and ever since his "terrible" and fear-inducing incident with a reckless Checker driver, he has been a loyal YCA customer on "hundreds" of occasions because he has believed YCA drivers to be responsible and their vehicles to be safer and cleaner than other cabs. He also said "Yellow Cab was my cab company" and "without a doubt I was relying on Yellow Cab [that night] as I had hundreds of times before." Zielinski corroborated Jacobs's habit evidence by testifying that she has taken numerous cabs with him over a period of many years and that he would invariably take YCA cabs. She testified that she and Jacobs would meet at a cabstand at least 40 to 50 times a year, for nine years, and that he would invariably insist on taking a YCA cab, even if that meant disregarding the public's custom of taking the first cab in line and waiting for a YCA cab to be available. She characterized Jacobs's regular practice of choosing only YCA as one of his "quirks." In addition to testifying to Jacobs's regular practice, Zielinski testified that when they left the restaurant that evening, Jacobs said "I'm going to go grab the Yellow cab," which is not the same as saying he was going to take "a cab."

¶ 94    From this evidence of Jacobs's habit of relying on YCA cabs even if it was inconvenient and his specific choice of taking "the Yellow cab" that evening, a jury could reasonably infer that Jacobs relied on YCA that night. Therefore, the Jacobses met their burden of providing " 'some evidence' " of reliance. *Nolan*, 233 Ill. 2d at 430, 910 N.E.2d at 556 (quoting *Thacker*, 151 Ill. 2d at 354, 603 N.E.2d at 454).

¶ 95    YCA makes the additional argument that the habit evidence was improperly admitted. Specifically, it argues that the Jacobses did not prove his conduct was "semi-automatic,"

occurred with "invariable regularity," and was nondiscretionary, because he occasionally chose to take Flash cabs. YCA argues a habit cannot be discretionary, and that his use of Flash cabs indicates he did not have a habit of selecting YCA vehicles. The Jacobses respond that his corroborated, uncontradicted testimony about his habit of taking Yellow cabs was "detailed, specific and similar enough to raise a reliable inference" that he conformed to his habit on the night of the crash.

¶ 96      Illinois has adopted Federal Rule of Evidence 406 (Fed. R. Evid. 406) regarding the admission of habit and routine practice evidence. *Alvarado v. Goepp*, 278 Ill. App. 3d 494, 496, 663 N.E.2d 63, 64 (1996); Ill. R. Evid. Committee Commentary 1 (adopted Jan. 1, 2011) (Illinois's rules of evidence had been created *ad hoc* through case law, statutes, and supreme court rules, until 2011 when the Illinois Supreme Court approved evidentiary rules modeled on the Federal Rules of Evidence). Rule 406 provides:

> " 'Evidence of the habit of a person or of the routine practice of an organization, *whether corroborated or not* and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.' " (Emphasis in original.) *Alvarado*, 278 Ill. App. 3d at 496, 663 N.E.2d at 64 (quoting Fed. R. Evid. 406).

¶ 97      The decision to admit habit evidence is within the trial court's discretion provided a proper foundation has been laid indicating that the conduct has become "semiautomatic, invariably regular and not merely a tendency to act in a given manner." (Internal quotation marks omitted.) *Alvarado*, 278 Ill. App. 3d at 497, 663 N.E.2d at 64. " 'It is the notion of virtually invariable regularity that gives habit its probative force.' " *Alvarado*, 278 Ill. App. 3d at 497, 663 N.E.2d at 65 (quoting Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 406.1, at 229 (6th ed. 1994)). See also Michael H. Graham, Graham's Handbook of Illinois Evidence § 406.1, at 287 (10th ed. 2010) ("Habit describes one's regular response to a repeated specific situation so that doing the habitual act becomes semiautomatic and extremely regular.").

¶ 98      YCA's reliance on *Knecht v. Radiac Abrasives, Inc.*, for the proposition that the conduct must "take[ ] on characteristics of a ministerial rather than discretionary act" is unavailing, because in that instance, the court was discussing routine business practices, rather than the habits of an individual. *Knecht v. Radiac Abrasives, Inc.*, 219 Ill. App. 3d 979, 987-88, 579 N.E.2d 1248, 1254 (1991) ("types of conduct qualifying for admission as a routine business practice are ministerial [not discretionary] acts: mailing, filing, sending notice, and the like"). An example of properly admitted habit evidence can be found in *Keller*, where the decedent's daughter testified that she visited her father at his shop every day, that he was open for business 13 hours every day of the week, and that during work hours he carried $300 to $400 cash on his person. *People v. Keller*, 267 Ill. App. 3d 602, 607, 641 N.E.2d 891, 894 (1994). The court found that the trial judge did not abuse his discretion in admitting the evidence and that the jury could infer from the testimony that the shopkeeper had a substantial amount of currency on his person on the day he was shot, and could infer from the fact that he had no currency on his person after the shooting that the shooter took that currency. *Keller*, 267 Ill. App. 3d at 609, 641 N.E.2d at 896.

¶ 99      Here, the testimony was detailed and included specific numbers and time parameters. It was also not mere conjecture or speculation and was reliable. As just discussed above, Jacobs testified that for approximately 15 years he always took Yellow cabs when he hailed one on the

street or at a cabstand because he believed the drivers were responsible and that the vehicles were safer and cleaner than other cabs. Zielinski testified that for nine years she met Jacobs at a cabstand near their offices at least 40 or 50 times a year and that he only took Yellow cabs, to the point that he would let other types of taxis go and wait for a YCA vehicle. Although he sometimes took Flash cabs as YCA now argues, Jacobs did so when he stayed late at the office, and he used Flash on these occasions because of the convenience of using a voucher to charge the cab fare and driver tip directly to his legal client. The fact that Jacobs occasionally chose to use Flash cabs when he stayed late in his office building does not undermine the evidence that his choice of YCA vehicles on other occasions was "semiautomatic, invariably regular and not merely a tendency to act in a given manner." (Internal quotation marks omitted.) *Alvarado*, 278 Ill. App. 3d at 497, 663 N.E.2d at 65. Therefore, we find no error in the court's admission of habit evidence. Moreover, the jury could properly conclude from the evidence that Jacobs was in a YCA vehicle that night not because of chance or some unexpected reason, but because of his purposeful, invariable habit of relying on YCA as a quality taxicab provider.

¶ 100    Finally, YCA contends that if the court properly admitted the habit testimony, the jury should have been instructed with a legal definition of habit. We reiterate that the trial court has discretion regarding which instructions to give the jury. *Luye*, 348 Ill. App. 3d at 773, 809 N.E.2d at 161. We will not find an abuse of discretion unless the instruction, considered as a whole, does not fully apprise the jury of the relevant law. *Luye*, 348 Ill. App. 3d at 773, 809 N.E.2d at 161. Illinois Rule of Evidence 406 does not provide a definition of habit. Ill. R. Evid. 406 (eff. Jan. 1, 2011). Nevertheless, as stated above, Illinois courts have held that a party seeking to admit habit evidence "must show conduct that becomes semiautomatic, invariably regular and not merely a tendency to act in a given manner." (Internal quotation marks omitted.) *Alvarado*, 278 Ill. App. 3d at 497, 663 N.E.2d at 65.

¶ 101    Here, after the court determined that an instruction on habit should be given, YCA requested that the court also include a legal definition of "habit." The court stated that it was not aware if there was an accepted legal definition and habit may just have its ordinary meaning. YCA replied that the jury "should know that they may have to find that in order to conclude that it's a habit, it's semi-automatic, invariably regular, and not just a tendency to act." The court denied the request to give a definition and reasoned that counsel could make that point in closing arguments. Ultimately the jury was instructed as follows:

> "You have heard testimony about whether or not Marc Jacobs had a habit of using taxicabs bearing the Yellow Cab Affiliation, Inc. emblem.
>
> It is for the jury to determine whether or not he had that habit.
>
> Evidence of the habit of a person may be used to prove that the conduct on a particular occasion was in conformity with the habit."

¶ 102    Upon review of the instruction given, we find that the jury was fully, fairly, and comprehensively apprised of the relevant law. *Luye*, 348 Ill. App. 3d at 773, 809 N.E.2d at 161 (quoting *Schultz*, 201 Ill. 2d at 273-74, 775 N.E.2d at 973). Although courts have referred to habit as a regular response to a distinct situation that is "semi-automatic" and "invariably regular," the jury was not required to make these specific findings. Moreover, there is no single accepted definition in Illinois. In addition, jury instructions are viewed as a whole and reversible error occurs only when a party shows the instructions misled the jury and seriously prejudiced the party's right to a fair trial. *Schultz*, 201 Ill. 2d at 285, 775 N.E.2d at 979. In this instance, as discussed above, the evidence was clear that Jacobs purposefully and habitually

used YCA vehicles. The jury could be properly instructed to take that evidence into account in determining whether he relied on YCA as a provider of taxicab services on the night at issue. There is nothing in the record to suggest that YCA was prejudiced in the least because the instruction it was given did not include certain terminology.

¶ 103 Ezeagu's primary contention on appeal is that the trial court abused its discretion by allowing the Jacobses' accident reconstruction expert to contradict eyewitness testimony about the cab's speed on the highway. Ezeagu contends Arce testified that from his perspective as a passenger in the box truck, the cab was traveling at a speed "just like us," at approximately 55 to 60 miles an hour, meaning at or about the posted highway speed limit, and thus, Arce corroborated Ezeagu's testimony that he drove (lawfully) at 55 miles per hour and was just passing the Ogden exit when Jacobs screamed and Ezeagu veered off the highway. Ezeagu contends that in Illinois, a reconstruction expert may testify only if there are "no eyewitnesses to the occurrence and it is necessary to rely on the [expert's] knowledge and application of principles of physics, engineering and other sciences beyond the ken of the average juror." *Block v. Lohan Associates, Inc.*, 269 Ill. App. 3d 745, 754, 645 N.E.2d 207, 214 (1993). Ezeagu contends that (1) neither of these two foundational requirements was met, (2) O'Hern improperly opined about the credibility or believability of a witness by testifying Arce "is not being truthful," and (3) O'Hern "did not use any science; instead, he just believed the eyewitness to be untruthful and [then] speculated [about the cab's highway speed]." Ezeagu contends he is entitled to a new trial due to O'Hern's improper testimony on a crucial issue.

¶ 104 The Jacobses respond that Ezeagu's discussion of the law is misleading, his recitation of the evidence is simply wrong, and O'Hern helped the jury make sense of the situation when he opined about details to which there was no eyewitness testimony.

¶ 105 Whether to admit expert reconstruction testimony is a matter within the trial court's discretion (*Palmer v. Craig*, 246 Ill. App. 3d 323, 327, 615 N.E.2d 1294, 1297 (1993)), and in our opinion, Ezeagu does not show that this standard was violated. Ezeagu incorrectly relies on the statement of an appellate court in 1993 that "[r]econstruction experts may testify where there are *no eyewitnesses to the occurrence* and it is necessary to rely on the [expert's] knowledge and application of principles of physics, engineering and other sciences beyond the ken of the average juror." (Emphasis added.) *Block*, 269 Ill. App. 3d at 754, 645 N.E.2d at 214. The supreme court subsequently commented in 1994 that some "not entirely successful attempts to [apply supreme court precedent]" had resulted in "unnecessary confusion about whether expert reconstruction testimony may be admitted where there is also an eyewitness." *Zavala v. Powermatic, Inc.*, 167 Ill. 2d 542, 546, 658 N.E.2d 371, 373 (citing Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 703.2, at 596 (6th ed. 1994)). The supreme court clarified that "[w]hether to admit expert reconstruction testimony, *eyewitness or not*, turns on the usual concerns of whether expert opinion testimony is appropriate generally." (Emphasis added.) *Zavala*, 167 Ill. 2d at 546, 658 N.E.2d at 373. Accordingly, even when there is an eyewitness, an expert's testimony may be admitted if that expert is (1) qualified in the field and (2) offers knowledge and the application of scientific principles that are beyond the ken of the average juror and thus, enables the jury to make factual determinations. *Palmer*, 246 Ill. App. 3d at 327, 615 N.E.2d at 1297 (the presence of eyewitnesses is but one factor, not the conclusive factor, in determining whether expert reconstruction testimony is admissible); *Watkins*, 172 Ill. 2d at 205, 665 N.E.2d at 1385 (whether to admit expert reconstruction testimony depends upon the usual concerns of whether

expert opinion is appropriate); *Coffey v. Hancock*, 122 Ill. App. 3d 442, 448, 461 N.E.2d 64, 69 (1984) (expert reconstruction testimony may supplement lay witness testimony "where knowledge and application of principles of physics and chemistry are necessary to the jurors' proper interpretation of a vehicle's speed"). Furthermore, an expert may testify as to an ultimate fact or issue without impermissibly treading on the fact finder's role, because the fact finder is not required to accept the expert's conclusion. *Zavala*, 167 Ill. 2d at 545, 658 N.E.2d at 373.

¶ 106      With regard to the first factor as to whether the expert's opinion should have been admitted, O'Hern testified at length about his qualifications in the field of accident reconstruction, and Ezeagu is not challenging them. Therefore, we address only the second factor, which is whether O'Hern's testimony was needed to explain scientific principles to the jury and if his testimony would help the jury in making factual determinations.

¶ 107      We note that Ezeagu is asking us to focus on a small part of Arce's testimony. Arce's eyewitness account did corroborate, to some extent, Ezeagu's statement about the highway speed of the cab, when Arce initially said that the cab was traveling at about 55 to 60 miles per hour and at about the same speed as the box truck Arce was traveling in. However, Ezeagu fails to address Arce's additional testimony that he then saw the cab speed up as it abruptly crossed from left to right in front of the box truck. Ezeagu's sudden movement and lane changes were what drew Arce's attention to the cab.

¶ 108      We also note that O'Hern never said Arce was "not being truthful," as Ezeagu now argues. O'Hern said many other things, such as pointing out that Arce "clearly said he [had] never even looked at the [box truck's] speedometer." O'Hern also said "the physical evidence doesn't match" all of Arce's recollections. Thus, O'Hern suggested Arce misjudged the situation, instead of suggesting that Arce was untruthful and had intentionally told falsehoods to the jury. Furthermore, when O'Hern was specifically asked on cross-examination whether he believed Arce's testimony, O'Hern answered: "I listened to it, but I didn't use their speed of 55 to 60 for anything in my opinion, so it doesn't matter if I believed it or not. I didn't use it." When pressed further on cross-examination as to whether he "[d]isregarded" Arce's estimate of the cab's highway speed, O'Hern unequivocally answered, "No. There was no reason to use it. He didn't tell me the speed of the vehicle when he left the road, so that's what I was looking for." Thus, Ezeagu has misstated O'Hern's remarks about Arce's testimony.

¶ 109      Furthermore, O'Hern was indicating that from his point of view as an accident reconstruction expert, the accident was caused by "the speed of the vehicle when he left the road," not by the earlier speed of the vehicle as it traveled on I-294. Therefore, Ezeagu's main argument for reversal focuses on a detail, his highway speed, which is information that O'Hern did not need to know, "didn't use," and had "no reason to use" when O'Hern calculated the cab's speed at that crucial moment when it "left the road." O'Hern, like defense expert Barrette, did not begin his work with Arce's estimate of the cab's highway speed and then work forward through the event. Nor did O'Hern first "speculate[ ]" about the cab's highway speed as Ezeagu now argues. Neither expert tried to first determine the vehicle's highway speed before the driver was in trouble. Instead, the experts began their calculations by determining the speed of the cab when it slammed into the concrete wall. Both O'Hern and Barrette determined the speed at the point of impact and then, working backward through the event, they calculated the cab's speed as it traveled across the grass, vaulted in the air, slipped off the banked edge of the cloverleaf, and traveled on the highway. O'Hern, like Barrette,

explained that he gathered data from various police reports and made use of his measurements and observations at the crash site, his personal inspections of the wrecked vehicle and an exemplar vehicle, some historical crash data from national databases, the vehicle's possible stopping distance at various speeds, mathematical calculations, principles of physics, and some manual or automated diagramming in order to extrapolate the cab's speed at individual stages of the accident. O'Hern, like Barrette, applied his training and experience to objective information to determine the speed of the vehicle not only when it crashed into the concrete wall but also when it traveled on I-294. Thus, Ezeagu's criticism of the expert testimony is a point not well taken. Ezeagu misstates the facts when he argues that O'Hern "did not use any science; instead, he just believed the eyewitness to be untruthful and [then] speculated [about the cab's highway speed]."

¶ 110　　Consistent with Arce's testimony that the cab was initially traveling at 55 to 60 miles per hour, but sped up in order to move to the exit ramp, O'Hern opined that the cab was moving faster than 55 miles per hour, at somewhere between 55 and 70 miles per hour, when the cab left the highway exit ramp. O'Hern also testified to the maximum speed at which the minivan could travel and still adhere to the curve of the exit ramp and the purpose of the ramp's advisory speed of 25 miles per hour. Arce did not testify about the cab's speed when it left the roadway, and without the expert testimony, there would have been no evidence indicating how fast the vehicle was moving at the critical moment when it went out of Ezeagu's control on the ramp. O'Hern's comprehensive testimony about the accident was based on physical evidence and mathematical concepts that are beyond the ken of the average juror, and O'Hern expert's opinion assisted the jury in making sense of a situation where there was only partial eyewitness testimony.

¶ 111　　In short, we agree with the Jacobses' contention that Ezeagu's description of the expert testimony is simply wrong, that his presentation of the law is misleading, and that O'Hern ultimately helped the jury make sense of the situation when he opined about details to which there was no eyewitness testimony. For this latter reason, we find that the reconstruction evidence was needed and properly admitted for the jury's consideration, and it is not a proper basis for reversal of the judgment. Furthermore, even if O'Hern's testimony was somehow damaging to Ezeagu's defense, Ezeagu had the opportunity to refute it with his own expert reconstruction witness. To have allowed one expert to opine, but not the other, would have been unfair. *Zavala*, 167 Ill. 2d at 547, 658 N.E.2d at 373; *Kelly v. American Motors Corp.*, 130 Ill. App. 3d 662, 672, 474 N.E.2d 814, 821-22 (1985) (where plaintiff put on expert testimony, it was unfair to prevent the defendant from introducing the same kind of evidence). For these reasons, we emphatically reject Ezeagu's main argument for reversal of the judgment.

¶ 112　　Like YCA, Ezeagu cites *Alvarado* and argues that the trial court erred in admitting general careful habit testimony because of a lack of foundation showing that Jacobs's "careful habits" were semiautomatic and invariably regular. *Alvarado*, 278 Ill. App. 3d at 497, 663 N.E.2d at 64. However, where YCA focused on Jacobs's and Zielinki's testimony, Ezeagu's appeal focuses on Deborah's testimony.

¶ 113　　Deborah told the jury that her husband is generally a man of "careful habits," and she answered affirmatively when asked specifically whether he was careful when riding a bicycle or driving a car, and is protective of his children and himself. When Ezeagu objected to the line of questioning, there was a sidebar conference, after which the trial judge said to the jury: "I'm

going to sustain the objection. Ladies and gentlemen, just disregard the testimony regarding power tools, bicycles, driving a car and protection of children. The remainder of the questions on that subject will stand."

¶ 114  Ezeagu contends that he was prejudiced by Deborah's testimony because she was the only witness to contradict his testimony that the accident was caused by his passenger's sudden and unexpected screaming. Ezeagu contends that his positive testimony would have allowed the jury to find that the passenger was the sole cause of the accident and then return a verdict in Ezeagu's favor.

¶ 115  The Jacobses respond that "careful habits" testimony is allowed where a plaintiff's retrograde amnesia prevents him from remembering the accident at issue, and also that Ezeagu was not prejudiced because the only basis for the jury's 12% fault adjustment was Ezeagu's testimony. The Jacobses contend their "careful habits" testimony was the only evidence they could use to contradict Ezeagu's self-serving and preposterous contention that he, a mature, professional driver, drove off the road and into a concrete wall because his passenger told him he was missing his turnoff.

¶ 116  It is within the court's sound discretion to admit or deny the introduction of evidence, and we reverse only if we find an abuse of that discretion. *Grewe v. West Washington County Unit District No. 10*, 303 Ill. App. 3d 299, 306, 707 N.E.2d 739, 744 (1999). It bears repeating that an abuse of discretion has occurred only when it can be said that no reasonable person would adopt the same view as the trial court. *Schwartz*, 177 Ill. 2d at 176, 685 N.E.2d at 876. Although usually evidence of general good habits is not admissible, evidence of careful habits is admissible to show due care when the plaintiff suffers from retrograde amnesia and no eyewitnesses other than the defendant are available. *Eichorn v. Olson*, 32 Ill. App. 3d 587, 591, 335 N.E.2d 774, 776 (1975) (admitting the testimony of a family member concerning plaintiff's careful habits where there were no witnesses to collision and plaintiff was unable to recall events at or before the time of impact, due to amnesia). This is the standard applicable to Ezeagu's argument, instead of the standard applicable to habit testimony, for which a foundation must be laid that the conduct is semiautomatic and invariably regular. See *Grewe*, 303 Ill. App. 3d at 306, 707 N.E.2d at 744.

¶ 117  Here, the court significantly limited Deborah's careful habits testimony. In fact, the court sustained Ezeagu's objection, struck almost all the questions and answers, and told the jury to disregard those statements. The remaining statement that Jacobs was generally a man of careful habits was permissible due to his retrograde amnesia. Therefore, we do not find that the court abused its discretion in allowing this minimal testimony.

¶ 118  Ezeagu next contends the jury instruction about habits was confusing, because the Jacobses offered testimony concerning two entirely different habits. In order to establish apparent agency, the Jacobses put on evidence of his habit of choosing YCA cabs, and in order to refute Ezeagu's defense, the Jacobses put on evidence of him being a man of careful habits. We set out the instructions earlier when addressing YCA's appeal, but repeat the brief instructions here and now point out that the trial court expressly referred to the first type of habit evidence:

"You have heard testimony about whether or not Marc Jacobs had a habit of using taxicabs bearing the Yellow Cab Affiliation, Inc. emblem.

It is for the jury to determine whether or not he had that habit.

- 32 -

Evidence of the habit of a person may be used to prove that the conduct on a particular occasion was in conformity with the habit."

¶ 119   Jury instructions are reviewed under the abuse of discretion standard (*Luye*, 348 Ill. App. 3d at 773, 809 N.E.2d at 161), and the propriety of instructions is determined by considering them in their entirety (*Saunders v. Schultz*, 20 Ill. 2d 301, 314, 170 N.E.2d 163, 170 (1960) (the test in determining the propriety of tendered instructions is whether the jury was fairly, fully, and comprehensively informed as to the relevant principles, considering the instructions in their entirety)). A reviewing court will not reverse on the basis of instructions unless they clearly misled the jury and resulted in prejudice to the appellant. *Sinclair v. Berlin*, 325 Ill. App. 3d 458, 464, 758 N.E.2d 442, 447 (2001).

¶ 120   Ezeagu fails to explain how he was prejudiced by the instructions. Furthermore, we are confident that the carefully phrased instructions as a whole did not confuse the jury on the subject of habits. We reject Ezeagu's argument for reversal and do not find that the court abused its discretion in giving the habit instruction.

¶ 121   Ezeagu also points out that the Jacobses argued general careful habits in their closing arguments despite assuring the court that they would not make such an argument. Notably, however, Ezeagu did not raise an objection at the time or include the issue in his posttrial motion. Failure to object to improper closing argument results in forfeiture of the objection on appeal. *People v. Winstead*, 90 Ill. App. 2d 167, 183, 234 N.E.2d 175, 184 (1967) (there is a general rule that the failure to object to closing arguments bars their review). Furthermore, as we said above with regard to YCA's posttrial motion, points which are omitted from a posttrial motion may not be raised on appeal. 735 ILCS 5/2-1202(b) (West 2014) (section of Code of Civil Procedure requiring that a posttrial motion contain the points relied upon, specify the supporting grounds, and state the relief desired); Ill. S. Ct. R. 366(b)(iii) (eff. Feb. 1, 1994) (supreme court rule indicating points, grounds, or relief that are not specified in a posttrial motion may not be argued on appeal). Waiver aside, Ezeagu's argument is unconvincing. Closing arguments occurred after the trial court's decision to give the instruction, and actions after the fact do not affect the propriety of the court's decision.

¶ 122   Ezeagu next argues the trial court erred in refusing a proposed special interrogatory on sole proximate cause because the special interrogatories that were accepted went to an ultimate factual issue and could have been answered inconsistently with the general verdict. The Jacobses respond that the court did not err in denying either of Ezeagu's proposed interrogatories because they were in the wrong format.

¶ 123   Use of a general verdict accompanied by written interrogatories requires the jury to give close attention to the more important issues in the case, and its answers serve as a check on the propriety of the general verdict. *First National Bank of Elgin v. Szwankowski*, 109 Ill. App. 2d 268, 275, 248 N.E.2d 517, 521 (1969). Under the plain language of section 2-1108 of the Code of Civil Procedure, the jury is required to answer a special interrogatories at the request of party:

> "Verdict—Special interrogatories. Unless the nature of the case requires otherwise, the jury shall render a general verdict. The jury may be required by the court, and must be required on request of any party, to find specially upon any material question or questions of fact submitted to the jury in writing. Special interrogatories shall be tendered, objected to, ruled upon and submitted to the jury as in the case of instructions. Submitting or refusing to submit a question of fact to the jury may be reviewed on

appeal, as a ruling on a question of a law. When the special finding of fact is inconsistent with the general verdict, the former controls the latter and the court may enter judgment accordingly." 735 ILCS 5/2-1108 (West 2014).

See *Thomas v. Johnson Controls, Inc.*, 344 Ill. App. 3d 1026, 1032-33, 801 N.E.2d 90, 95-96 (2003).

¶ 124    Under this authority, the trial court has no discretion to reject a special interrogatory that is in proper form. *Thomas*, 344 Ill. App. 3d at 1033, 801 N.E.2d at 96. A special interrogatory is in proper form if it meets the following criteria: "(1) it relates to an ultimate issue of fact upon which the rights of the parties depend, and (2) an answer responsive thereto is inconsistent with some general verdict that might be returned." *Simmons v. Garces*, 198 Ill. 2d 541, 563, 763 N.E.2d 720, 734 (2002). Furthermore, the special interrogatory should be a single question, worded in terms that are simple, unambiguous, and understandable to the jury; the question must not be repetitive, confusing, or misleading. *Simmons*, 198 Ill. 2d at 563, 763 N.E.2d at 735.

¶ 125    Ezeagu proposed two special interrogatories regarding proximate cause. The first one read: "Did Marc Jacobs immediately before the time of the occurrence in question fail to exercise ordinary care for his own safety, which was the proximate cause of his injuries? Yes No" The court reasoned that this interrogatory would not serve as a general check on a general verdict.

¶ 126    The first proposed special interrogatory was properly rejected because it consisted of two clauses, which taken together, was not answerable with a single "Yes" or "No." This compound interrogatory allows for only two options: (1) that Jacobs failed to exercise ordinary care and was the sole cause of his injuries, or (2) that Jacobs did not fail to exercise ordinary care and was not the sole cause of his injuries. There were, however, other possible factual findings which could support a negligence verdict. For example, the jury could answer "Yes" to did "Jacobs *** fail to exercise ordinary care for his own safety" but then "No" to "which was *the* proximate cause of his injuries." (Emphasis added.) In fact, any jury that found contributory negligence, as the jury did in this case, would not be able to answer this special interrogatory. The proposed special interrogatory was flawed because it was not a single, straightforward question, and thus, it was properly rejected.

¶ 127    Ezeagu then proposed a second special interrogatory, asking "Were Marc Jacobs' actions on the night of the accident the sole proximate cause of plaintiff's injuries and damages? Yes No" This was not a compound interrogatory, however, the language was so broad that a responsive answer would not necessarily be inconsistent with a general verdict. It is not clear what part of the verdict is being tested because the question does not specify any particular "actions on the night of the accident." It could refer to Jacobs's action of selecting Ezeagu's cab, giving directions, using his phone during the ride, or yelling out to exit the highway. The reason for Jacobs's action of selecting the YCA-affiliated cab was a contested issue, and separately, his actions during the cab ride and the extent to which they contributed to the accident were also disputed. Thus, the proposed second special interrogatory was not in proper form, and the trial court did not err by rejecting it. Furthermore, Ezeagu is incorrect when he contends that his second proposed special interrogatory was "nearly identical" to the following one found acceptable in *Snyder*: " 'On the date of the accident and at the time and place of the accident in question in this case, was the driving conduct of the plaintiff, Norma Snyder, the sole proximate cause of the accident?' " *Snyder v. Curran Township*, 281 Ill. App. 3d 56, 62, 666 N.E.2d 818, 822-23 (1996). The *Snyder* special interrogatory not only specified that the

conduct in question occurred " 'at the time and place of the accident' " but also further narrowed the jury's focus to the " 'driving conduct of the plaintiff.' " *Snyder*, 281 Ill. App. 3d at 62, 666 N.E.2d at 822-23. Ezeagu's proposed second interrogatory referred generally and broadly to "Marc Jacobs' actions on the night of the accident."

¶ 128    Ezeagu finally contends that because there was inadequate evidence of the wife's damages, the trial court erred in denying Ezeagu's motion for a remittitur of her $3.96 million award for loss of consortium. The Jacobses respond that deference should be given to the careful, deliberative process of the jury, and that because the award falls within the flexible range supported by the facts, the jury's decision should not be disturbed. Also, the trial court was in the best position to evaluate the evidence and did not abuse its discretion when it denied Ezeagu's motion.

¶ 129    Deborah's testimony as to her damages was as follows. Deborah and her husband first met in high school when they both worked at a Kentucky Fried Chicken restaurant, began dating during her sophomore year and his senior year in college, and were married in 1985, a few weeks after he took the bar exam. With her bachelor's degree in physical therapy, she took a job at the Rehabilitation Institute of Chicago in 1985, and went to night school at Northwestern Kellogg to earn her MBA in health care. After that, Ernst & Young hired her in 1989 to do health care facilities planning. She switched to part-time work with the firm in 1992, after the Jacobses' first son was born, and she quit the job about six months after their second son was born in 1997. She was a full time stay-at-home parent only for about two years, because in 1999, a former Ernst & Young colleague called for help with a project and Deborah decided to start her own consulting business. The fact that her husband's income kept growing over the years gave Deborah the flexibility to either consult on projects or stay home with the kids. The boys were in third and seventh grades when the accident occurred in 2005. Her husband went back to work in 2006, but it quickly became apparent that he was struggling and that she needed to take a full-time job to provide for their family. Her work led to her having a major client in California, and that led to the couple's decision in 2013 to transfer to San Diego so she could become a senior manager with her employer and possibly a partner.

¶ 130    Because of the accident, her husband is often overwhelmed by stimuli such as music and lights, "can very quickly kind of get out of control," worries a lot, and is distractible. The Jacobses can no longer engage in ordinary dialogue, because if she interrupts him instead of raising her hand, he will forget what he was talking about. His cognitive fatigue causes him to be "literally on the couch and done" by 3:30 or 4 p.m. and unable to have "meaningful conversations" in the evening. The family now rarely entertains guests. They used to be "just easy going, kind of spontaneous and flexible," but now her husband does best by being "in a very predictable environment" and maintaining a strict schedule of being asleep every night by 9 p.m. Prior to the accident, he had a good sense of humor, was playful, engaging, and was known for being witty, but because of his injuries, he is not as quick as he once was and he does not smile very much anymore. Although Deborah likes to sleep in the same room with him, she sometimes leaves, because he now has sleep apnea and snores due to a deviated septum. They are still each other's best partners, but she no longer feels supported in her goals and she avoids sharing unpleasant information with him. Their relationship has changed because she now has to take care of him, but the depth and scope of her love has not changed.

¶ 131    The *de novo* standard is used when reviewing the denial of a motion for remittitur. *Diaz v. Legat Architects, Inc.*, 397 Ill. App. 3d 13, 45, 920 N.E.2d 582, 608 (2009). Remittitur is

appropriate only where a jury's verdict falls outside the range of fair and reasonable compensation, is the result of passion or prejudice, or is so large that it shocks judicial conscience. *Wagner v. City of Chicago*, 254 Ill. App. 3d 842, 860, 626 N.E.2d 1227, 1240 (1993) ("[d]amages are peculiarly an issue of fact for a jury to determine and are subject to reversal [only] when excessive"); *Carroll v. Preston Trucking Co.*, 349 Ill. App. 3d 562, 571, 572, 812 N.E.2d 431, 439, 440 (2004) (a jury award will not be compared to jury awards in other cases but will be reviewed to ensure that it is within the range of fair and reasonable compensation, does not appear to be a product of passion or prejudice, and is not so large that it shocks the judicial conscience).

¶ 132 Our review of the record indicates the jury's award is supported by sufficient evidence and that there is no basis for concluding that that the amount is excessive or based upon some improper motive. Deborah's testimony and the medical evidence about her husband's injuries and prognosis indicate there is no question that she has suffered and will continue to suffer a diminished relationship with her husband. She still loves him and considers him her best partner, but their relationship was irretrievably changed by his injuries. She can no longer carry on an ordinary conversation with her partner because he is distractible, she must be careful not to give him upsetting information, and she cannot have a meaningful discussion with him after 3:30 or 4 p.m. in the afternoon because he is too fatigued. They were once an "easy going," "spontaneous," and "flexible" couple, but now they rarely invite people into their home; he needs a "very predictable environment," which is not overstimulating, and he must turn in quite early every night to get sufficient rest. He is no longer the quick person she married, and he no longer smiles as much as he did. In addition, they have switched roles and she now takes care of him, she cannot necessarily look to him for emotional support, and she has become the family's primary breadwinner. In a nutshell, Jacobs is not the companion that he once was to Deborah.

¶ 133 Furthermore, the award of $3.96 million is sizeable, but we do not find that the trial court abused its discretion in concluding that the amount is within the fair range of reasonable compensation. Deborah conveyed facts which support the award and indicate the amount is proportionate compensation for her irretrievable loss.

¶ 134 Ezeagu ignores much of her testimony, however, by focusing on positive statements, such as that Jacobs continues to be a kind person, he still has a gift of humor, he is still her best partner, and she now loves him "even more." Deborah said much more than the reader would gather from Ezeagu's appellate brief. As detailed above, she continues to have a positive, loving relationship with her partner, but he is not the person he used to be and their interactions have changed dramatically to accommodate his needs. Furthermore, she once had the flexible schedule of a part-time consultant, but she had to reenter the workforce; she became the family's primary breadwinner, and they have relocated to southern California to further her career.

¶ 135 Ezeagu also plays up the fact that there was little testimony regarding the couple's conjugal relationship. Ezeagu argues the only testimony suggesting a "loss of consortium" was Deborah's testimony that her husband snores sometimes and that she moves to another room, and the husband's testimony that since the accident they are "less frequently" intimate, though there is still great affection between them. A loss of consortium claim, however, encompasses not only conjugal relations but also companionship. *Brown v. Metzger*, 104 Ill. 2d 30, 34, 470 N.E.2d 302, 304 (1984) ("Loss of consortium encompasses two basic elements of the marital

relationship ***, which includes companionship and sexual intercourse."); *Monroe v. Trinity Hospital-Advocate*, 345 Ill. App. 3d 896, 899, 803 N.E.2d 1002, 1005 (2004) ("The basis for recovery for loss of consortium is interference with the continuance of a healthy and happy marriage and injury to the conjugal relation."); *Dini v. Naiditch*, 20 Ill. 2d 406, 427, 170 N.E.2d 881, 891 (1960) (consortium includes material support, companionship, felicity, and sexual intercourse). Ezeagu cites no authority that supports his limited definition of a consortium claim, and there was ample testimony regarding the change in the Jacobses' marriage due to his injuries.

¶ 136    The record does not indicate the multi-million dollar verdict falls outside the range of fair and reasonable compensation or is the result of the jury's passion or prejudice, and although it is a substantial award, it is not so large that we find it shocking. Accordingly, we reject Ezeagu's argument that the trial court abused its discretion by denying his motion for remittitur.

¶ 137    For these reasons, we affirm judgment for the Jacobses and against YCA and Ezeagu.

¶ 138    Affirmed.

¶ 139    JUSTICE COBBS, dissenting.

¶ 140    The majority analyzes this case as if it were a typical apparent agency case, but this case is plagued with facts and circumstances that make it far from typical. When its unique nature is taken into account, it is abundantly clear that the court's ruling granting plaintiff's motion *in limine* No. 23 and barring evidence of the city ordinances was not only based on a misapplication of the law but led to a misleading presentation of evidence that confused the jury and, ultimately, substantially prejudiced YCA. In such circumstances, the court has abused its discretion and we are compelled to remand the case for a new trial. *Ayala v. Murad*, 367 Ill. App. 3d 591, 601 (2006) (holding that exclusion of relevant evidence is an abuse of discretion where the error was serious and prejudicial). The majority completely ignores the *sui generis* nature of taxicab regulation in Chicago, as well as established principles of apparent agency, which paves the way for a routine, but flawed, abuse of discretion analysis. We are not required to automatically affirm every ruling reviewed for an abuse of discretion, and we must always be mindful of our overriding concern to obtain a just, fair, equitable, and impartial adjudication of the parties' rights. See, *e.g.*, *Smith v. Illinois Central R.R. Co.*, 223 Ill. 2d 441, 451-52 (2006). Because I disagree with the majority's analysis and its conclusion, I respectfully dissent.

¶ 141    In my view, the resolution of this apparent agency case must be viewed within the complete framework that governed YCA's behavior to determine the extent that YCA's voluntary actions constituted "holding out." Unlike other industries where an apparent principal has complete control over the appearance of agency, that is not the case for the taxicab industry in the city of Chicago. First, it should be noted that in the typical apparent agency case there are two actors: the alleged apparent agent and the alleged apparent principal. Here, there are four: the city of Chicago, YCA, Zegus, Inc., and Ezeagu. For reasons unknown, plaintiffs voluntarily dismissed Zegus, Inc., the owner of the taxicab and the entity that actually controlled Ezeagu's conduct, the day of trial.

¶ 142    Second, affiliations, medallion owners, and taxicab drivers are subject to comprehensive regulation that is designed to prioritize public safety, urban planning, and even social justice.

In some ways the taxicab industry is more similar to a public utility than to the brands like Starbucks, Nike, and Lou Malnati's. In reality, YCA is mandated by the Code to provide the color scheme, emblem, dispatching services, address, telephone number, registered agent, and insurance to affiliates that the Code requires, but which might be too cumbersome for an individual medallion holder to maintain for themselves and for the city to regularly check-up on. Chicago Municipal Code § 9-112-010(a) (amended Nov. 15, 2000). In other words, taxicab affiliations help unify and identify medallion owners to assist the city in regulating them effectively. See, *e.g.*, Chicago Municipal Code §§ 9-112-390 (affiliate shall paint the affiliation color scheme, trade name or emblem, and telephone number on the exterior of the vehicle to establish the responsibility of the affiliation in the operation of the taxicab), 9-112-230(c) (affiliation cannot dispatch a cab unless a vehicle is properly licensed), 9-112-230(e)(1) (affiliation is responsible for ensuring that dispatch equipment is activated and operating at all times when the cab is in service), 9-112-215(e) (affiliations are responsible for ensuring drivers comply with rules regarding underserved areas), and 9-112-230(j) (requiring affiliations to offer a continuing education program or be charged a fee) (amended Nov. 15, 2000).

¶ 143　　In its opinion, the majority fails to acknowledge that the role of an affiliation is, in part, to assist the city in regulating taxicabs by ensuring its members' compliance with the Code. The majority's oversight is particularly troubling when it refers to the "Affiliation Agreement" (which was barred by the court on plaintiffs' motion but about which plaintiffs' counsel nevertheless systematically questioned the owner of the taxicab) which, as the majority also notes, provides that YCA reserves the right to give "final approval" regarding the "shade and/or tone of the Colors on the Taxicab" and the "forms and locations of the affiliation's insignia on the vehicle." Missing, however, is any mention by the majority that YCA is required to include certain provisions in its contracts and to ensure that its affiliates are complying with the Code.

¶ 144　　Another factor that differentiates this case from the ordinary apparent agency case is that any benefit YCA receives from the appearance of agency is highly attenuated. The considerations set forth in *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511 (1993), are instructive. In *Gilbert*, our supreme court extended the application of apparent agency to the medical industry. *Id.* at 522. In doing so, the court reasoned that apparent agency should apply in that context because, looking to the industry as a whole, the court observed that modern hospitals were becoming "big business" by increasingly holding themselves out as the provider of medical services and were competing with each other to attract customers through expensive advertising campaigns. The court further observed that when the independent contractor physicians do their job well, the hospitals profit financially. *Id.* at 520.

¶ 145　　None of the characteristics found in *Gilbert* are present here. First, the city completely changed the way the taxicab industry functioned in the 1990s to implement the affiliation structure. This was done, in part, to give the city more control over taxicabs for the purpose of promoting public safety and to limit the size of taxicab companies such as the former Yellow Cab Company. Thus, although the former Yellow Cab Company owned medallions and provided taxicab services, the city regulations broke up that regime, causing the company to sell its medallions until it did not own any. Further, rather than intentionally holding itself out as a provider of taxicab services, members of the taxicab industry requested that they be able to inform the public that the taxicabs were independently owned and operated and that request

was denied. Furthermore, the regulations cap the percentage of affiliates that an affiliation can have to 25% of the total number of licensed taxicabs (Chicago Municipal Code § 9-112-230(b) (amended Nov. 15, 2000)) and set the cost of the fees affiliates pay (Chicago Municipal Code § 9-112-230(k) (amended Nov. 15, 2000)). In addition, taxicab affiliations only receive money from fees paid by medallion owners and do not receive money from "fares." Thus, they do not receive any money from the public or financially benefit when a driver does his job well. As the owner of the taxicab testified, it is common for medallion owners to periodically change affiliations because the affiliation of a cab has little to do with how many "fares" they get. When people hail a cab, most just take the first cab available. Taking all of these circumstances together, it is evident that to examine whether a taxicab affiliation was an apparent principal without considering the city's regulatory scheme that controls their behavior makes neither legal nor practical sense.

¶ 146    The majority is able to avoid discussing the particular circumstances that define this case by concluding that the ordinances were not relevant because the city did not require YCA to choose the "distinctive" yellow color or "nearly the same logo of its predecessor." Significantly, these facts alone do not resolve the question presented here: whether or not evidence of the ordinances had "any tendency to make the existence of a fact that is of consequence to the determination of the action either more or less probable [than] it would be without the evidence." (Internal quotation marks omitted.) *McHale v. Kiswani Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 89. In my view, it is unquestionable that the city ordinances meet that low standard because they make whether YCA held itself out as a provider of taxicab services more or less probable.

¶ 147    My conclusion is rooted in established principles and the purpose of apparent agency which make clear that an apparent principal's conduct must be voluntary. Inexplicably, the majority does not engage in this inquiry, despite the fact that YCA's defense below was that the alleged indicia of agency were required by ordinance and were not voluntary and, further, a central question presented by YCA in its brief was whether ordinances and other legal requirements can have an effect on the creation of apparent agency. Instead, the majority deems the selection of a particular name, color scheme, and logo dispositive as a matter of law of the element of "holding out."

¶ 148    Although there are many exceptions, normally, one who engages the services of an independent contractor is not liable for the torts the independent contractor commits. *Letsos v. Century 21-New West Realty*, 285 Ill. App. 3d 1056, 1065 (1996); Restatement (Second) of Torts § 409 (1965). The reasoning behind the common law rule is that an employer has no power or control over the independent contractor, thus the independent contractor should be responsible for preventing the risk. Restatement (Second) of Torts § 409 cmt. b (1965). The doctrine of apparent agency, also called apparent authority, however, imposes liability on a putative principal where its conduct causes an innocent third party to reasonably assume that an agency relationship exists. *O'Banner v. McDonald's Corp.*, 173 Ill. 2d 208, 213 (1996) (citing *Gilbert* 156 Ill. 2d at 523-24). Consequently, under apparent agency, there may be "authority in an agent *** which the principal holds the agent out as possessing." *Gilbert*, 156 Ill. 2d at 523.

¶ 149    To establish apparent agency, a plaintiff must show: "(1) that the principal held the agent out as having authority or knowingly acquiesced in the agent's exercise of authority; (2) based on the actions of the principal and agent, the third person reasonably concluded that an agency

relationship existed; and (3) the third person relied on the agent's apparent authority to his detriment." *Oliveira-Brooks v. Re/Max International, Inc.*, 372 Ill. App. 3d 127, 137 (2007) (citing *Gilbert*, 156 Ill. 2d at 525). It is well settled that apparent authority must be based on the words and acts of the principal. *Cove Management v. AFLAC, Inc.*, 2013 IL App (1st) 120884, ¶ 24 (citing *Lawcock v. United States Trotting Ass'n*, 55 Ill. App. 2d 211, 217 (1965)). Although in an apparent agency relationship the principal does not have actual control over an independent contractor, we look to whether the apparent principal's conduct controlled the appearance of agency that was created. *Id.* If the apparent principal's actions or knowledge combined with acquiescence created the impression of agency, it is fair to hold it responsible as if it were an actual principal. See *O'Banner*, 173 Ill. 2d at 213; *Bank of Waukegan v. Epilepsy Foundation of America*, 163 Ill. App. 3d 901, 907 (1987). A plaintiff cannot merely present evidence of what he or she believed manifested an appearance of agency, the agency must flow from the principal. See *Cove Management*, 2013 IL App (1st) 120884, ¶ 24; *Northern Trust Co. v. St. Francis Hospital*, 168 Ill. App. 3d 270, 278 (1988); Restatement (Third) of Agency § 2.03 (2006).

¶ 150   The doctrine of apparent agency is based on the principles of estoppel. *O'Banner*, 173 Ill. 2d at 213; *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 187 (2006). Liability is imposed despite the lack of an actual agency relationship because the apparent principal's conduct caused the third party's belief that an agency relationship existed. *O'Banner*, 173 Ill. 2d at 213. "The idea is that if a principal creates the appearance that someone is his agent, he should not then be permitted to deny the agency if an innocent third person reasonably relies on the apparent agency and is harmed as a result." *Id.*

¶ 151   Considering that an essential element of apparent agency is based on the apparent principal's conduct, finding apparent agency where a putative principal legally has no control over its manifestations of agency would not further apparent agency's equitable purpose. In fact, Williston on Contracts explains that agency by estoppel arises from a principal's "*voluntary act.*" (Emphasis added.) 12 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 35:13, at 224 (4th ed. 1999). Accordingly, whether an apparent principal's manifestations were voluntary or controlled by ordinance is relevant to determining whether it "held out" that it was the principal of the apparent agent.

¶ 152   It is undisputed that the provisions of the Code strictly regulate the appearance of taxicabs. In fact, the city's regulation of the appearance of taxicabs is so comprehensive that Bapat described it as "bumper to bumper." The Code, as well as the deposition testimony of Bapat, Moberg, Dilanjian, and Ellis, make clear that, with one limited exception, all medallion owners are required to join an affiliation and they are mandated to paint their cars with the affiliation's color scheme, logo, and telephone number. Chicago Municipal Code §§ 9-112-080(b)(7), 9-112-390 (amended Nov. 15, 2000). According to the Code, this information must be displayed in precise locations on the exterior of the taxicab. Chicago Municipal Code § 9-112-390 (amended Nov. 15, 2000). The Code even specifies that words must be "painted in plain Gothic letters and figures of one-half-inch stroke and at least four inches in height." *Id.* The Code lists many other requirements that involve the appearance of taxicabs, including provisions requiring a top light, clear visibility of cab number, cleanliness, and limiting advertisement. See Chicago Municipal Code §§ 9-112-050, 9-112-150, 9-112-160, 9-112-300 (amended July 12, 1990); § 9-112-390 (amended Nov. 15, 2000).

¶ 153    Additionally, the language of the Code is unambiguous that "[n]o other name, number, emblem, or advertisement of any kind excepting signs required or permitted by this chapter, official license emblems or metal plate shall be painted or carried so as to be visible on the outside of any taxicab unless otherwise required by state law." Chicago Municipal Code § 9-112-390 (amended Nov. 15, 2000). Accordingly, by the terms of the Code, affiliations were not permitted to disclaim that the vehicle was independently owned and operated, the primary method by which an apparent principal can limit liability. See *Gilbert*, 156 Ill. 2d at 525; *York*, 222 Ill. 2d at 196-97. Bapat's testimony supports this fact. Although she averred that she personally had never received an application asking to place the wording "independently owned and operated" on the exterior of a taxicab, it is apparent from reviewing her testimony that the city only permitted language and images specifically listed in the Code to be placed on a vehicle.

¶ 154    It is uncontroverted that some characteristics of the taxicab Ezeagu was driving were mandated by ordinance and others were the result of YCA's voluntary conduct. The question before the jury should have been whether the aspects of the taxicab's appearance that were the result of YCA's voluntary conduct established "holding out." Evidence of what the Code requires, and likewise prohibits, certainly makes whether YCA voluntarily held itself out as Ezeagu's apparent principal more or less probable. Therefore, evidence of the Code was relevant.

¶ 155    The majority's emphasis on the weaknesses in the witnesses' testimony that was included in YCA's offer of proof simply confuses the issue. Most of these weaknesses would go to the weight of the witnesses' testimony and could be adequately addressed by cross-examination. I disagree with the majority that Moberg and Dilanjian's testimony was too remote. Moberg testified that he last requested the "independently owned and operated" language in 2002 or 2003, only two or three years before the accident, and Dilanjian requested the language between 1997 and 2000. It is an unreasonable burden to require associations to continuously request language that the city has repeatedly denied. Moreover, even if these witnesses' testimony was properly barred, their testimony was not necessary for YCA's Code evidence to be admitted. Notably, the court could take judicial notice of the city ordinances. *Central Austin Neighborhood Ass'n v. City of Chicago*, 2013 IL App (1st) 123041, ¶ 13 ("Courts may take judicial notice of facts proven by 'immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy.' [Citation.]"); *Daniels v. City of Venice*, 162 Ill. App. 3d 788, 791 (1987) (explaining that trial courts may take judicial notice of municipal ordinances). Additionally, I strongly disagree that this issue was too confusing for the jury to consider. The court had the power to limit evidence of the Code to matters that concerned the appearance of the taxicab and the jury was capable of reviewing all the relevant evidence and determining the extent YCA held itself out as a provider of taxicab services.

¶ 156    Not only was the Code relevant, but its exclusion substantially prejudiced YCA, constituting an abuse of discretion. A trial court abuses its discretion if it " 'act[s] arbitrarily without the employment of conscientious judgment, exceed[s] the bounds of reason and ignore[s] recognized principles of law *** or if no reasonable person would take the position adopted by the court.' [Citation.]" (Internal quotation marks omitted.) *Alm v. Loyola University Medical Center*, 373 Ill. App. 3d 1, 4, (2007) (quoting *Schmitz v. Binette*, 368 Ill. App. 3d 447, 452 (2006)). This court has explained that the exclusion of relevant evidence is an abuse of discretion that warrants reversal where the error is serious and results in prejudice.

*Ayala*, 367 Ill. App. 3d at 601. That is exactly what has occurred here, where the court ignored established principles of apparent agency, YCA was prevented from presenting evidence that supported its theory of the case, and where the evidence as it was presented was extremely misleading.

¶ 157 It is clear from the record that the court misapplied basic principles of apparent agency. At oral argument on the motion, plaintiffs argued that the ordinances would only be relevant to establishing actual agency. Because their claim was only for apparent agency, they argued that the ordinances must be excluded as irrelevant. In ruling, the court accepted plaintiffs' argument and stated:

> "This is not a matter of actual agency. It's a matter concerning apparent agency. And as both sides are familiar with theory, this is a theory of liability that defendants may be subject to that relate [*sic*] solely to appearances, not to actualities. In other words the legal status of the defendant is really not at issue here. Their status and their relationship legally to the medallion owner and to the eventual taxicab driver, however that person is driving the vehicle, through lease or any sort of arrangements, is really irrelevant to the question of fact before the Jury about appearances here, about whether or not this was an apparent agent, about holding out and detrimental reliance."

¶ 158 The court's reasoning reflects a misunderstanding of the role the city ordinances played in this case. The provisions of the Code strictly regulate the appearance of taxicabs. Although in an apparent agency case we are not concerned with who actually controlled the conduct of the driver, the entity that actually controlled the appearance of the vehicle is essential to the claim and is what apparent agency is based upon. Here, the Code was offered not to show the actual legal status of Ezeagu or that YCA did not "control" his conduct. Rather, it was offered to show that YCA's alleged manifestations of agency, demonstrated by the appearance of the taxicab, were not voluntary and to provide context of the taxicab industry by explaining that the affiliation structure was created by the Code and one of its purposes is to facilitate the city's enforcement of its regulations.

¶ 159 Additionally troubling here is that throughout this trial, including at oral arguments on plaintiff's motion to bar evidence of the ordinances, the court seemed to accept plaintiffs' contention that the only relevant concern in this apparent agency case was Marc's state of mind and whether he believed, based on the appearance of the taxicab, that Ezeagu was YCA's agent. This argument ignores the basic precept of apparent agency law that the manifestations of apparent agency must be traceable to the principal. Restatement (Third) of Agency § 2.03 (2006). It is not sufficient for a plaintiff to merely prove his or her state of mind based on what appeared to be an agency relationship. See *Oliveira-Brooks*, 372 Ill. App. 3d at 137. If that were the case, defendants would be strictly liable for the torts of others whenever their name appears on a vehicle that another person is driving, regardless of who put it there and whether they had knowledge of the appearance.

¶ 160 Furthermore, as plaintiffs point out in their brief, the court's decision rested, in part, on *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17 (1999), a case that holds that evidence of private contractual arrangements does not control a claim for apparent agency. It is obvious that such a contractual arrangement would not control an apparent agency case. I would point out, however, that *Petrovich* does not hold that that a private contractual arrangement is irrelevant to an apparent agency claim. In an apparent agency case, there is no requirement, neither is it desirable, that the jury not know who the actual principal was if one

exists, as it did in this case. Nor is it necessary to prevent the jury from hearing information about any "actualities." The actual circumstances of the case, however, always matter. Significantly, the entity actually responsible for the appearance of the taxicab was the very question to be decided. It should not be the goal of trial in an apparent agency case to persuade the jury that a defendant was an actual principal by so limiting the evidence such that the jury misperceives the relationships between the parties. Rather, the goal is to provide the jury with all the relevant evidence and to allow the jury to determine whether: (1) the principal held the agent out as having authority or knowingly acquiesced in the agent's exercise of authority; (2) based on the actions of the principal, the third person reasonably believed that an agency relationship existed; and (3) the third person relied on the appearance of authority to his detriment. *Oliveira-Brooks*, 372 Ill. App. 3d at 137 (citing *Gilbert*, 156 Ill. 2d at 525).

¶ 161    Even more significant here, the court's error completely prevented YCA from presenting evidence to support its theory of the case that the alleged manifestations of agency were involuntary because they were required by city ordinance. It is axiomatic that a fair trial demands that a defense be fully heard (*West Chicago Street R.R. Co. v. Shannon*, 106 Ill. App. 120, 127 (1903)) and that " '[e]ach party is entitled to present evidence which is relevant and material to its theory of the case.' " *1601 South Michigan Partners v. Measuron*, 271 Ill. App. 3d 415, 417 (1995) (quoting *Haffa v. Haffa*, 115 Ill. App. 2d 467, 474 (1969)). YCA's main defense leading up to trial was that it did not voluntarily create the impression of agency—a defense which, given that the cab was painted yellow and had the YCA logo on its exterior, is implausible without evidence of the ordinances.

¶ 162    Prejudice to YCA was compounded by plaintiffs' attempts to prohibit any evidence of the Code, which was extremely misleading and unfairly strengthened plaintiffs' case. Without this evidence, the inaccurate implication arose that every aspect of the taxicab's appearance was chosen by YCA to cultivate a brand. The jury heard substantial evidence regarding the appearance of the taxicab that Ezeagu was driving and about the appearance of taxicabs generally. Yet, despite the fact that it is undisputed that the appearance is highly regulated, the jury was prevented from hearing evidence that the city controlled any aspect of the taxicab's appearance at all. The evidence, as presented, would have begged the jury to make the assumption that every aspect of the appearance of the taxicab was the result of YCA's voluntary actions.

¶ 163    Further strengthening this implication is the fact that here plaintiffs explicitly pursued lines of questioning and arguments that conflated aspects of the appearance of the taxicab that were chosen by YCA with aspects that were actually required by the city. Knowing that evidence of the Code was barred, plaintiffs' counsel nevertheless asked the owner of the vehicle leading questions suggesting that YCA chose the location of the logo, the presence of the phone number on its exterior, presence of a top light, to have inspections, to provide training, to provide dispatch services, and controlled the vehicles' cleanliness. Each of these aspects of a taxicab's appearance and its maintenance are dictated by the Code. To the extent that YCA also required these things, it was a function of its mandated role of assisting the city by ensuring medallion owners comply with the Code. Despite plaintiffs' counsel's obvious frustration, the owner's answers that these aspects of the taxicab's appearance were required by the city were completely correct. It is fundamentally unfair to allow plaintiffs to ask questions about aspects of the appearance that the Code required, but then prevent YCA from explaining that they were mandatory. Moreover, it is apparent that these questions confused

the jury. Notably, plaintiff's counsel's questions and the owner's answers prompted a juror to ask: "[d]oes the City require that a cabdriver be associated with an affiliate like Flash, Yellow, or Carriage *** or is it voluntary?" In accordance with the court's exclusion of the Code regulations, that question went unanswered.

¶ 164    The confusion of what the city required as opposed to what YCA required continued during Moberg's testimony. On direct examination, when asked about taxicabs' appearance, Moberg accurately answered that certain symbols and their location on a taxicab were required by the Code. It was clearly challenging for him to adequately answer questions about the appearance of taxicabs out of context. Because of the court's ruling on the motion *in limine*, Moberg was forced to awkwardly avoid any reference to the Code despite the fact that the Code dictates many aspects of a taxicab's appearance. Plaintiffs' counsel repeatedly objected to reference to the Code and many of the objections were sustained. Nevertheless, some of answers were not objected to and remained in the record. Consequently, the jury heard confusing allusions to the Code without explanations.

¶ 165    Additionally, plaintiffs argued in their closing argument that aspects of the taxicab's appearance, some of which were actually required by the city, were created by YCA to "build customer loyalty," "build market share," and "attract the revenue." This argument is persuasive to a jury but distorts reality. As discussed above, an affiliation's market share is limited by the Code, and they do not receive money from "fares." If evidence of the Code had been admitted, plaintiffs would not have been able to unfairly strengthen their case by inaccurately portraying the extent YCA benefitted from the appearance of the taxicab and "branded" itself.

¶ 166    The majority concludes that evidence of the Code would have taken the jury's attention away from YCA's voluntary conduct. What is clear from the record, however, is that the jury was presented with evidence of the taxicab's appearance that was unquestionably not a result of YCA's voluntary conduct. The only way to clarify what aspects of the taxicab's appearance were results of YCA's voluntary conduct was to permit YCA to introduce the city's ordinances. The majority also labels evidence of the Code as a red herring and agrees with the trial court that it would have taken the jury on an irrelevant "frolic." I disagree. The extent that YCA's conduct voluntarily created the appearance of agency is no small question and is one which the jury is better suited to decide. "Holding out" is the link by which the law deems it fair to find an affiliation—with no power to reject a driver or freely terminate a medallion owner's membership (Chicago Municipal Code § 9-112-230(h) (amended Nov. 15, 2000)) and that has no actual control over the maintenance or safety of a vehicle—nevertheless responsible for accidents that the driver or the vehicle cause.

¶ 167    Thus, the court's error deprived YCA of the opportunity to meaningfully defend itself. With evidence of the ordinances, the element of holding out was no doubt close. Although a jury could still find that YCA held itself out as Ezeagu's apparent principal because it chose a specific yellow color and recognized logo, with knowledge of the ordinances, a jury could just as reasonably conclude the opposite. The court's ruling did more than tip the scales in favor of plaintiffs—it made any conclusion other than that YCA created the appearance of agency impossible.

¶ 168    Finally, it should be noted that by finding evidence of the Code irrelevant, the majority effectively imposes strict liability on affiliations for the torts of drivers because without knowledge of the Code, the appearance of a taxicab will always be attributed to the affiliation.

This result is at odds with our decision in *Daniels v. Corrigan*, 382 Ill. App. 3d 66 (2008). Although *Daniels* concerned actual agency, the court in that case explained that "simply acting in conformity with the Code" alone could not be evidence establishing actual agency. *Id.* at 78. The court made this conclusion, in part, because it is evident that the city did not intend for affiliations to be an insurer of all medallion owners. *Id.* at 73. Yet, by finding that it would be too confusing for the jury to differentiate voluntary conduct from Code requirements, that is exactly the regime that the majority has created in this case. The jury should have received evidence of the Code so that it could properly evaluate YCA's conduct in context.

¶ 169 In conclusion, allowing plaintiffs to present evidence of the appearance of the taxicab without providing the jury with the necessary context to evaluate the appearance was, in my view, prejudicial error. Although the Code was relevant to interpreting the evidence and arguments presented, the jury only heard the information that supported plaintiffs' contentions and did not hear YCA's argument that the alleged manifestations of agency were involuntary. Evidence pertaining to each element of the claim should have been allowed, not just evidence regarding what Marc perceived. My disagreement with the majority rests on my belief that the resolution of the question of whether YCA had held itself out as an apparent principal was for the jury and not for the court to decide. I do not mean to suggest that admission of the Code evidence would have precluded a finding of apparent agency in this case. Without it, however, no other finding was possible.

¶ 170 Thus, for all of the foregoing reasons, I dissent.